**UNITED STATES of America, Appellee,**

v.

**Muhammad ABDUL–SABOOR, Appellant.**

No. 95–3044.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 1996.

Decided June 7, 1996.

Allen E. Burns, Assistant Federal Public Defender, argued the cause for appellant, with whom A.J. Kramer, Federal Public Defender, was on the briefs.

Pamela S. Satterfield, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John Fisher, and Thomas C. Black, Assistant United States Attorneys, were on the brief.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Appellant Muhammad Abdul–Saboor challenges the district court's denial of his motion to suppress the drugs and guns seized from his apartment during a warrantless search. The district court ruled that the search was valid as a protective sweep or, alternatively, because the evidence inevitably would have been discovered in the warranted search for documents conducted the next day. The court did not reach the Government's further argument that the evidence was seized as the result of a lawful search incident to the defendant's arrest.

When his suppression motion was denied, Abdul–Saboor entered a conditional plea of guilty to charges of possession with intent to distribute cocaine base, commonly known as crack, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of a firearm in relation to that offense, in violation of 18 U.S.C. § 924(c)(1). The only question on appeal, therefore, is the validity of the search. The dispute over the proper answer to that question is narrowed by the Government's concession that the search here cannot be upheld as a protective sweep in view of our holding in *United States v. Ford*, 56 F.3d 265 (D.C.Cir.1995) (protective sweep requires articulable suspicion that area to be searched harbored individual posing danger).

For the reasons that follow, we hold that the drugs and firearms were lawfully seized from Abdul–Saboor's apartment incident to his arrest. Accordingly, we affirm the district court's denial of Abdul–Saboor's motion to suppress that evidence without reaching the inevitable discovery doctrine invoked by the district court. *See Molerio v. Federal Bureau of Investigation*, 749 F.2d 815, 820 (D.C.Cir.1984) (court of appeals may affirm judgment of district court upon any valid ground).

## I. Background

In July 1993 Deputy U.S. Marshals Robert Parker and Karen Skillman went to Abdul–Saboor's apartment in order to arrest him on a bench warrant issued in an unrelated case. The defendant, who had opened the door wearing a bathrobe, asked and was allowed to change clothes before leaving the apartment. Entering his bedroom, which was lit only by the glow of a television set, he stealthily picked up a loaded .45 caliber handgun from the television table and tried to hide it in front of his body.* Fortunately Deputy Parker saw the maneuver; he drew his weapon and ordered the defendant to drop the gun—which Abdul–Saboor did not do until the officer threatened to shoot him. Deputy Skillman then handcuffed Abdul–Saboor and seated him in a chair at a point she later estimated to be four feet outside the bedroom doorway.

Deputy Parker testified that when he returned to the bedroom in order to pick up Abdul–Saboor's handgun he noticed a loaded semi-automatic MAC–11 pistol and a magazine with ammunition in it lying on the television table. He took the weapons and the magazine to the kitchen, then guarded Abdul–Saboor while Deputy Skillman went to the car to request assistance in order to process the crime scene. When Skillman returned, Parker revisited the bedroom. As he opened the blinds for light he saw on top of the television set, partially obstructed by a framed picture, several small bags of what looked like crack. Parker then searched the apartment for additional weapons. He discovered a sawed-off shotgun under a mattress and another shotgun wrapped in a white plastic trash bag lying on the floor, protruding from the doorway of an open closet. Back in the kitchen, Parker found a stun gun on top of the refrigerator. He also noticed boxes of ammunition on open shelves in the dining room. When the police arrived

---

* Testifying at his suppression hearing, Abdul–Saboor acknowledged that the handgun was on the table but denied that he ever picked it up, claiming instead that he was only reaching to turn off the television. On appeal Abdul–Saboor cites that testimony but does not otherwise dispute the findings of the district court in any relevant respect; indeed, his argument proceeds from the premise that he did pick the gun up from the table.

they found $420 in a plastic cup on the kitchen table.

The next day Parker obtained and executed a search warrant for evidence that Abdul–Saboor lived in the apartment. He and other officers thoroughly searched the entire apartment, finding ample documentary and physical evidence that the defendant lived there.

On appeal Abdul–Saboor argues that the district court should have suppressed the evidence that Deputy Parker seized from his apartment as a result of Parker's returning to the bedroom, namely the drugs and the shotguns. He objects to the Government's inevitable discovery rationale upon two grounds. First, the record does not show that the apartment was secured between the warrantless search that followed his arrest and the warranted search conducted the next day; accordingly, he argues, "the Government failed to make the required showing, by a preponderance of the evidence, that the drugs and the other guns still would have been in the apartment when the search warrant was executed." Second, the Government did not demonstrate that the search for documents and other evidence that the defendant lived in the apartment would routinely have extended to those places where the drugs and guns were found.

The Government responds first that the contents of the apartment do not appear to have been disturbed between the arrest and the search of the following day. Abdul–Saboor testified that his uncle and his landlord had keys to the building, but he made no representation that anyone other than himself had a key to his apartment. Moreover, claims the Government, the entire apartment was thoroughly examined during the document search; neither the drugs nor the shotguns could possibly have escaped detection.

The Government's alternative theory is that the search was validly conducted incident to the defendant's arrest. In opposition to that theory Abdul–Saboor asserts that the area searched was not accessible to him at the time of the search. The Government counters that the marshals were entitled to search the area that was within Abdul–Saboor's immediate control at the time of his arrest notwithstanding that he had been subdued by the time of the search.

We express no view upon the question whether discovery was inevitable in this case. We need not resolve that issue because we agree with the Government that the search was incidental to the arrest.

## II. Analysis

A warrantless search or seizure inside a home is presumptively unreasonable within the meaning of the Fourth Amendment, *United States v. Dawkins,* 17 F.3d 399, 402 (D.C.Cir.1994). There are certain exceptions, though, one of which is for the search, incident to a lawful arrest, of the area within the arrestee's "immediate control." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) ("ample justification ... for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence"). This exception reflects the "potential dangers lurking in all custodial arrests." *United States v. Chadwick,* 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977). Accordingly, even though the reasons for conducting a search incident to arrest, namely "to disarm and to discover evidence," may be stronger in some situations than in others, the Government is not obliged to justify each such search in the particular context in which it occurs. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

For our purposes, therefore, the determinative inquiry is simply whether Abdul–Saboor's bedroom was an area within his immediate control at the relevant time, bearing in mind that "the articulation and definition of the 'area within immediate control' [is] a question of law." *United States v. Johnson,* 18 F.3d 293, 294 (5th Cir.1994). We review questions of law *de novo,* as do we review the district court's "application of legal standards to the facts of the case." *Spencer v. National Labor Relations Board,* 712 F.2d 539, 563 (1983).

The Government contends, first, that the question whether the drugs and shotguns were within Abdul–Saboor's area of immediate control is to be answered by reference to the time at which the arrest occurred, not the time at which the search occurred. For this point the Government relies heavily upon *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), in which the Supreme Court, applying *Chimel*, approved the admission of evidence obtained from the search of an automobile conducted while the former occupants, who had been arrested, were being detained by the side of the road. *Id.* at 456, 101 S.Ct. at 2862. The search authorized in *Belton* extended precisely to the areas within the arrested persons' immediate control at the time they were arrested, encompassing the passenger compartment of the car and any containers found therein but excluding the trunk. *Id.* at 460 & n. 4, 101 S.Ct. at 2864 & n. 4.

As Abdul–Saboor reminds us, however, the Court in *Belton* was doing "no more than determin[ing] the meaning of *Chimel*'s principles in this particular and problematic context." *Id.* at 460 n. 3, 101 S.Ct. at 2864 n. 3. So what are the defining characteristics of the context to which the Court was referring?

Abdul–Saboor would have us read *Belton* as a case peculiarly about automobile passenger compartments and the containers found in them. Of course, the Court's reference to the "particular and problematic context" of that case is susceptible to a wide range of interpretations; it could refer to the nature of the conduct for which the defendants were arrested (possession of drugs), or the potentially menacing situation of a single officer arresting four people, or to the presence of other inculpatory evidence—each of which the Court noted, *see id.* at 457, 101 S.Ct. at 2862–63—or to any combination of these or of other variables. To the extent that *Belton* might be thought to apply only to automobiles, however, we have already rejected that interpretation. *See United States v. Brown,* 671 F.2d 585, 587 (D.C.Cir.1982) (*"Belton* covers cases such as this one in which the search is contemporaneous with a lawful custodial arrest and is confined to containers in

hand or within reach when the arrest occurs").

In *Brown* the contents of a zippered pouch were admitted into evidence even though by the time it was searched the pouch had been moved beyond the reach of the defendant, who was being detained on a street corner. *Id.* at 586. Furthermore, the Court in *Belton* itself said "there is no need here to consider whether the search and seizure were permissible under the so-called 'automobile exception,'" 453 U.S. at 462–63 n. 6, 101 S.Ct. at 2865 n. 6, which certainly suggests that some other factor or factors determined the outcome. Finally, to the extent that *Brown* might be thought to apply *Belton* only to containers, it is of no help to Abdul–Saboor: the drugs found in his apartment were contained in small bags and even one of the shot guns was wrapped in a plastic trash bag.

■ As for the temporal as opposed to the spatial dimension of an arrestee's "immediate control," we think it significant that the Supreme Court in *Belton* looked to the time of the arrest, not to the time of the search, *id.* at 456, 460, 101 S.Ct. at 2862, 2864; we expressly followed suit in *Brown,* 671 F.2d at 587. From these two cases the Government concludes that the determination of immediate control must be made when the arrest occurs.

■ We agree. As we stated in *Brown,* a search is conducted incident to an arrest so long as it is an "integral part of a lawful custodial arrest process." *Id.* Indeed, we specifically advised trial courts not to focus upon "whether the suspect held the item in his grasp or could have reached for it at the moment of the arrest." *Id.* The relevant distinction turns not upon the moment of the arrest versus the moment of the search but upon whether the arrest and search are so separated in time or by intervening events that the latter cannot fairly be said to have been incident to the former. *See, e.g., Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485–86 (search conducted long after defendant taken into custody held not incident to arrest); *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964)

(search not incident to arrest if remote in time from arrest).

Indeed, if the courts were to focus exclusively upon the moment of the search, we might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer. That danger is not necessarily terminated by the arrest. As the Supreme Court pointed out in *Belton* responding to an analogous argument, "no search or seizure incident to a lawful custodial arrest would ever be valid [if] by seizing an article ... an officer may be said to have reduced that article to his 'exclusive control' "—and thus to have ended the defendant's control. 453 U.S. at 461–62 n. 5, 101 S.Ct. at 2865 n. 5. Likewise if by arresting and securing the defendant, an officer may be said to have put the area where the arrest took place under his own control—and thus outside the arrestee's "exclusive control"— then, the law would truly be, as Mr. Bumble said, "a ass."

Abdul–Saboor insists nonetheless that there is no sound basis upon which to conclude that the drugs and guns were within his immediate control either at the time of his arrest or at the time of the search. He was arrested at his apartment door when he first answered the marshals' knock. All of the relevant contraband was in the bedroom. Deputy Parker testified that at the time of the disputed (second) search of the bedroom, Abdul–Saboor was handcuffed and seated in a chair in the entrance area that also served as the dining room, about four feet from the bedroom door. (Deputy Skillman's testimony placed Abdul–Saboor approximately one foot into the hallway outside the apartment door—which could, as far as the record shows, still be about four feet from the bedroom door.)

In our view Abdul–Saboor artificially segments his arrest and the search; they were, as a practical matter, one continuous event. The defendant was unclothed when the marshals announced their purpose to arrest him. At his request the marshals permitted him to go to the bedroom, where he armed himself with a pistol and might well have thereby gained control over the other weapons and

the drugs but for one of the arresting officers' having seen him grab the gun. By arming himself after the process of arrest had begun, Abdul–Saboor turned the routine execution of a bench warrant into a life-threatening process—which began at the door of the apartment, continued into the bedroom, and was not over until Abdul–Saboor was handcuffed and seated some four feet outside the bedroom.

In *Chimel* the Supreme Court held that a search of any "area from within which [the arrestee] might gain possession of a weapon or destructible evidence" is uniquely justified. 395 U.S. at 763, 89 S.Ct. at 2040. In this case the room that was searched was within the area where the arrest occurred; moreover, it was not only an area from which the defendant in theory "might gain possession of a weapon" but the area from which he had in fact obtained a weapon.

Abdul–Saboor insists, however, that we must construe *Chimel* differently in the light of our 1983 holding in *United States v. Lyons*, 706 F.2d 321 (D.C.Cir.1983). There we established the following standard: "To determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither an acrobat [nor] a Houdini." *Id.* at 330. *Lyons* does add another element to the "immediate control" test, and the new element clearly relates to the time of the search: If, when the search occurs, the arrestee has been "immobilized" so that the area to be searched is not "conceivably accessible" to him, then the search is no longer incident to his arrest. Showing that the area searched was "conceivably accessible at the time of the search" was not meant to be difficult, however. As the court acknowledged in *Lyons* itself:

> Custodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp. Thus, searches have sometimes been upheld even when hindsight might suggest that the likelihood of the defendant reaching the

area in question was slight. *See, e.g., United States v. Mason,* 523 F.2d 1122, 1125–26 (D.C.Cir.1975) (sustaining search of a closet "three or four feet" away from a standing, handcuffed defendant who had attempted to obtain a jacket hanging therein).

706 F.2d at 330.

At the time of the disputed search in *Lyons,* the arrestee was handcuffed and sitting on a chair near the doorway of his hotel room; the closet being searched was "several yards away"; there were six police officers in the room, of whom four "presumably" were armed. No weapons had yet been uncovered. The court found it "inconceivable that Lyons could have gained access" to the closet in which police found a gun in the pocket of a trench coat. Moreover, the court thought these facts significant: "Lyons never made any attempt to reach the closet, nor did he even request access to it," *id.* at 330–31; after his arrest Lyons briefly "collapsed" and had been "revived and immobilized" before the search began, *id.* at 324; the arresting officers knew for a fact that Lyons was alone, *id.* at 324; and one of the officers admitted that at the time of the search he did not fear for his personal safety, *id.* at 325.

The facts here are roughly similar in a couple of respects. Like Lyons, Abdul–Saboor was handcuffed, sitting on a chair not far from the area to be searched. And in each case at least one police officer was armed. But there the similarities end. In all other relevant respects, the facts of the two cases are significantly different. First, unlike Lyons, Abdul–Saboor had specifically requested entry to the area searched; once there, he seized and attempted to hide a loaded handgun. Second, the arresting officer had discovered yet another loaded weapon and a magazine in Abdul–Saboor's apartment prior to the disputed search. Third, the record does not indicate that Abdul–Saboor suffered any infirmity that would impede his physical ability; by comparison, Lyons had collapsed shortly after his arrest. Fourth, Lyons was handcuffed and "immobilized" prior to the search; there is no indication that Abdul–Saboor, although handcuffed, was otherwise physically restrained. Fifth, as part of an undercover investigation, police had arranged for the hotel room in which Lyons was staying, *id.* at 324; thus the search took place on comparatively neutral turf as contrasted with Abdul–Saboor's apartment, which was unfamiliar to the arresting officers but a known cache of weapons to the arrestee.

As these facts indicate, Abdul–Saboor had demonstrated both the capacity and the desire to avoid arrest. Lyons had demonstrated neither. A willful and apparently violent arrestee, faced with the prospect of long-term incarceration, could be expected to exploit every available opportunity, including any opening that enabled him to flee from one officer, run a few feet to the bedroom, and seize a deadly weapon. As the Ninth Circuit has pointed out, "*Chimel* does not require the police to presume that an arrestee is wholly rational. Persons under stress may attempt actions which are unlikely to succeed." *United States v. McConney,* 728 F.2d 1195, 1207 (9th Cir.1984) (en banc). For that matter, having already uncovered a loaded handgun, a loaded semi-automatic pistol, and a magazine, the arresting officers could well anticipate that other weapons were stowed throughout the apartment, perhaps even within the area in which Abdul–Saboor was seated.

▮ Absent some objective basis upon which to conclude that the arresting officer had no reason to fear either the arrestee or the environment in which the arrest unfolded, we agree with our sister circuits that a search of the area where the arrest occurred in circumstances such as this case presents is a search incident to arrest. *See, e.g., Davis v. Robbs,* 794 F.2d 1129, 1130–31 (6th Cir. 1986) (arrestee handcuffed and placed in squad car prior to seizure of rifle in house); *United States v. Cotton,* 751 F.2d 1146, 1147–48 (10th Cir.1985) (arrestees handcuffed and apparently guarded by officer while state trooper searched vehicle); *United States v. Silva,* 745 F.2d 840, 847 (4th Cir.1984) (arrestees handcuffed and guarded by agents prior to search of room for weapons); *United States v. Palumbo,* 735 F.2d 1095, 1096–97 (8th Cir.1984) (arrestee surrounded by several officers and may have been handcuffed prior to search of room); *United States v. Roper,* 681 F.2d 1354, 1357–59 (11th Cir. 1982) (arrestee handcuffed in hallway of mo-

tel and escorted inside room by agents prior to search of briefcase); *Virgin Islands v. Rasool,* 657 F.2d 582, 585, 588–89 (3rd Cir. 1981) (arrestee handcuffed and removed from automobile prior to search of vehicle); *all cited in United States v. Queen,* 847 F.2d 346, 352–54 (7th Cir.1988) (arrestee guarded by two armed officers, hands cuffed behind his back, prior to search of closet three feet away). In short, the Government has satisfactorily demonstrated both that the area in question was within Abdul–Saboor's "immediate control" at the time of his arrest—as required by the Supreme Court in *Chimel* and *Belton*—and that the area was "conceivably accessible" to Abdul–Saboor at the time of the search—as required by this court in *Lyons.*

### III. Conclusion

For the reasons stated, we hold that the warrantless search of Abdul–Saboor's apartment was a lawful search incident to his arrest. Accordingly, the district court properly denied Abdul–Saboor's motion to suppress the evidence seized from his apartment during that search. His conviction is therefore

*Affirmed.*