**UNITED STATES of America,**

v.

**Andre MASSENBERG, Appellant.**

No. 01–3594.

United States Court of Appeals,
Third Circuit.

Submitted April 25, 2002.

Decided May 9, 2002.

Before BECKER, Chief Judge,
SCIRICA, and RENDELL, Circuit
Judges.

OPINION

BECKER, Chief Judge.

Defendant Andre Massenberg appeals
from the judgment entered on the verdict
of a jury adjudging him guilty of posses-
sion of a firearm and ammunition by a
convicted felon, in violation of 18 U.S.C.
§ 922(g). The trial followed an evidentia-
ry hearing on Massenberg's motion to sup-
press physical evidence and his statement
to the arresting officers that there was a
shotgun under the bed in the room where
he was arrested. The District Court de-
nied Massenberg's suppression motion,
and, after trial, filed findings of fact and
conclusions of law in support of this ruling,
including the important finding that the
shotgun was in fact under the bed and not
between the mattress and the box spring.

Most of the facts are not in dispute.
Indeed, Massenberg in his brief adopts
"the following undisputed findings of fact
ably set forth by the suppression court:"

Prior to arriving [at the Defendant's
home], [the police were] informed that
the [d]efendant that they sought to ap-
prehend had been involved in a home
invasion robbery involving guns and
three other [d]efendants, that he had a
prosthesis for a missing left leg, that he
may have a .22 caliber handgun hidden
in that leg, that two of the other perpe-
trators of the home invasion robbery
had been arrested. One other was still
at large, and the defendant was likely to
be armed and dangerous.

When the officers arrived at the
home, they secured the front, side and
rear of the property. Officer Prosser
watched from the windows at the front
of the home, from across the street, also
the doors and roof. McClendon, Clark
and Fellows then went to the front of
the door and did the knocking and an-
nounced, loud knocks and loud voices.
Prosser observed movement of the
blinds at the second floor bedroom win-
dow to his left, indicating that somebody
heard the police knocking and announce-
ments. Nobody arrived at the door and
at that point the officers at the door
broke open the door and entered the
property along with Officer Prosser.
McClendon, Prosser and Fellows imme-
diately ran upstairs to the bedroom
while others secured other areas of the
house on the first floor and in the base-
ment.

McClendon went to the middle bed-
room and Fellows and Prosser went to
the front bedroom and yelled police, and
entered the bedroom. Fellows at this
point had his gun out. Prosser pulled
off the bed sheets off the folks on the
bed and found the Defendant, who was
naked, a female who was in pajamas or
some type of clothing and a child who
was clothed.

The Defendant was then recognized
as the person who was the subject of the

arrest warrant. He was arrested and cuffed by the officers face down on the bed. Prosser observed that the Defendant had jeans and a boot on the floor at the foot of the bed extending underneath the bed and that the Defendant's prosthesis was not on his leg. He then grabbed the jeans and boot which were heavy and, as I've indicated, the boot and the artificial leg were inside the jeans. Sergeant Fellows asked several times whether there were any guns in the house, where is the .22.

At that point, Prosser was about to cut the jeans in order to inspect the prosthesis at which point the Defendant yelled, there is a shotgun under the bed. Prosser did not then cut the jeans and instead went under the bed and pulled out the shotgun. . . .

Br. of Appellant at 7–8 (quoting Trial Court Findings of Fact and Conclusions of Law, N.T., 4/4/01, at 9–10).

Massenberg's able counsel argues with great logical and rhetorical force, urging us to hold that:

the gunpoint interrogation of an unarmed, one-legged, naked suspect who is handcuffed behind his back in a residential bedroom with only a woman and children present in the small residence constitutes an illegal interrogation.

He reasons that his client:

at first, refused to answer the questions concerning the whereabouts of the weapon. Then during the interrogation, the police threatened to cut open his prosthesis and/or take it from him for x-rays at the Philadelphia Airport in an effort to compel him to answer questions about the presence of any weapons. The police never informed the defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, prior to, or during the custodial interroga-

tion. Such interrogation violates *Miranda*, *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), and the Fifth Amendment of the United States Constitution. Further, no cognizable exception to *Miranda* and *Dickerson* is applicable. Specifically, the "narrow" "public safety exception" created in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) is neither warranted factually in this case nor has it been extended by this Circuit or the Supreme Court of the United States to private residences rather than public settings.

Thus, he submits, the statement as to the whereabouts of the gun must be suppressed.

Massenberg further argues that the shotgun, seized without a warrant, must be suppressed. First, he submits, the shotgun was located and seized as the direct result of the illegal custodial interrogation, and hence must be suppressed as fruit of the illegal custodial interrogation. Second, he contends that the shotgun was not within his "immediate control" at the time of its discovery and seizure since he was already naked, face down on the bed, handcuffed behind his back to restrict movement, one-legged, and out-numbered by armed police officers. Therefore, he asserts, the warrantless seizure of the shotgun does not fall within the search-in-cident-to-lawful-arrest exception to the warrant requirement.

Important to this latter contention is Massenberg's argument that the District Court made a clearly erroneous finding of fact by concluding the shotgun was seized from under the bed rather than between the mattress and box spring (where Massenberg now contends it was located). He submits that the supervising officer executing this warrant testified unequivocally in the Philadelphia Court of Common

Pleas at a suppression hearing on the underlying case that the shotgun was located between the mattress and box spring, not under the bed, and that in District Court, the officer, when confronted with this prior testimony, was uncertain whether the shotgun was between the mattress and box spring or under the bed. Massenberg submits that if the gun was between the mattress and box spring, the shotgun must be suppressed because its discovery falls outside the permissible scope of a search incident to a lawful arrest, as well as outside the proper scope of a protective sweep of the premises.

The Government devotes much of its brief to *New York v. Quarles,* 467 U.S. 649, 655–56, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), noting that in *Quarles* the Court held that:

> if a threat to the police or public safety necessitates immediate questioning of a suspect, the suspect's statements are admissible, despite a failure to secure the suspect's waiver of his *Miranda* rights. The *Quarles* exception covers questioning related "to an objectively reasonable need to protect the *police* of the public from any immediate danger . . . ." *Id.* at 659 n. 8 (emphasis supplied).

The Government further submits that:

> [C]ourts have repeatedly applied *Quarles* to uphold the admission of statements by arrestees respecting

whether they are armed or there are weapons present.[1]

The Government submits that:

> In the circumstances here, the police were not obliged to give Massenberg *Miranda* warnings before determining from him whether and where any weapons were in the bedroom. The officers knew that Massenberg was wanted for armed robbery; he was said to keep a handgun in his prosthesis; two of his three co-defendants had been arrested in a house where the police seized two pistols, ammunition, a bulletproof vest, and narcotics; a third co-defendant was at large; the police had seen movement in the room where they later found Massenberg; and Massenberg had not responded to the officers' knocking so that they had to break his door down to execute the arrest warrant.

Thus, all of the robbers had to be presumed to be armed and dangerous; one robber, in addition to Massenberg, was at large; and Massenberg and this other robber knew that the police were looking for them, as the first two suspects had been arrested about a week earlier. Massenberg had not responded to police knocking, giving him time to secrete weapons or the remaining robber. Finally, Massenberg's arranging himself in bed with a woman and child, pretending to sleep after the police had broken his door and shouted throughout the house, showed that he had prepared

---

1. The Government cites *United States v. Williams,* 181 F.3d 945, 953–54 (8th Cir. 1999) (upholding admission of defendant's pre-*Miranda* response to question "is there anything we need to be aware of?" asked of handcuffed defendant with prior gun involvement and involvement in drug dealing); *United States v. Shea,* 150 F.3d 44, 48 (1st Cir. 1998) (upholding admission of response to agent's pre-*Miranda* questioning about whether robbery suspect had any weapons), *cert. denied,* 525 U.S. 1030, 119 S.Ct. 568, 142 L.Ed.2d 473 (1998), *recognized as abrogated on other grounds, United States v. Mojica–Baez,* 229 F.3d 292 (1st Cir.2000); *United States v. Knox,* 950 F.2d 516, 519 (8th Cir. 1991) (response to pre-*Miranda* question whether drug dealer had gun was admissible because drug dealers are known to arm themselves); *United States v. Brady,* 819 F.2d 884, 887–89 (9th Cir.1987) (permitting pre-*Miranda* gunpoint questioning of handcuffed suspect about whether there was a gun in his car), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988).

himself for their arrival and might have planned some scheme by himself or with others to harm or attempt to elude them.

■ Although the Government states that "[t]he police would have acted irresponsibly had they not asked whether and where there were weapons in his bedroom," Massenberg responds, as suggested above, that the *"Quarles* exception" should not apply under these facts where Massenberg was handcuffed on the bed in his house. While the parties ably brief this issue with point and counterpoint, we need not resolve it to decide this case. That is because the case can be decided on narrower grounds. In short, we believe the search must be upheld as a search incident to a lawful arrest.[2]

Important to our conclusion is our acceptance of the District Court's factual finding that the shotgun was located underneath the bed and not in between the mattress and the box spring, as Massenberg claims. As noted above, there was conflicting testimony as to the shotgun's location, but the District Court concluded

that "the great weight of the evidence is that the gun was under the bed." Factual findings made by the District Court in the course of ruling on a suppression motion are reviewed for clear error. *See United States v. Roberson*, 90 F.3d 75, 77 (3d Cir.1996). An error is clear only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). In light of the evidence supporting the District Court's conclusion—namely, the testimony of both Sergeant Fellows and Officer Prosser—we cannot conclude that the District Court's finding was clearly erroneous, and therefore analyze this case from the premise that the seized shotgun was located under the Defendant's bed.[3]

As described above, the police arrested Massenberg as he lay face down on the bed. It is of course well-settled that a search incident to a lawful arrest is valid and does not require a separate warrant. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685

2. As noted, the Government also contends that the search of the area under the bed can be justified as part of a valid "protective sweep" of the premises. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). This argument is inapposite, however, for the concept of a "protective sweep" applies only to areas of the arrestee's residence *other than* the room in which he is arrested. *Id.* at 334.

3. Massenberg notes that during a state court hearing concerning the underlying arrest, Sergeant Fellows, the supervising officer, testified that the shotgun was located in between the mattress and box spring. During the District Court's suppression hearing, however, which occurred approximately one year later, Fellows testified that the gun was located under the bed. When questioned about this discrepancy during the District Court hearing, Fellows explained that he had participated in the execution of approximately 2,000

arrest warrants during his fourteen months as head of the warrant squad, and admitted that he had "made some errors" in his testimony before the state court. Fellows further explained that during the arrest his "observation point was more toward the closet," whereas Officer Prosser was responsible for searching the bed area. Prosser testified unequivocally before the District Court that the shotgun was located under the bed. In light of Fellows' plausible explanation of the inconsistency in his statements, as well as Prosser's unequivocal testimony on the matter, we cannot say that we have a "definite and firm conviction" that the District Court's factual finding was erroneous. *U.S. Gypsum*, 333 U.S. at 395; *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

(1969). The scope of such a search includes the area "within [the arrestee's] immediate control[,] ... mean[ing] the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763. Because the floor under the bed was within the reach of Massenberg when he was arrested, it was permissible for the police to search for a weapon in that area during the course of the arrest.

Massenberg protests that because he was handcuffed behind his back prior to the police conducting the search under the bed, the shotgun was not within his "immediate control," and was therefore outside the proper scope of the search incident to his lawful arrest. We recognize that there is some logical force to Massenberg's argument in that it would appear that at the time of the search he was not in a position to either reach for a weapon or destroy any evidence. However, this Court's opinions, as well as those from many other courts of appeals, have recognized that even when an arrestee is handcuffed, a search of the area that was within the defendant's immediate control when he was arrested is valid so long as it is conducted within a time span close to the arrest and while the defendant is still within the general proximity of the arresting officers. *See Government of Virgin Islands v. Rasool,* 657 F.2d 582, 585, 588–89 (3d Cir.1981) (upholding search of automobile incident to driver's arrest after driver had been handcuffed but remained in the vicinity of the arresting officer); *see also United States v. Turner,* 926 F.2d 883, 887–88 (9th Cir.1991) (upholding search of area of room in defendant's immediate control before his arrest, although defendant had been handcuffed and removed from room); *United States v. Abdul–Saboor,* 85 F.3d 664, 670–71 (D.C.Cir.1996) (search upheld although defendant had been handcuffed and was outside bedroom in which he was arrested).

Moreover, because the area under the bed provided a potential hiding place from which an attack on the officers could have been launched by an associate of Massenberg, the police were justified in searching it to ensure their safety. *See Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ("hold[ing] that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"). Indeed, for this reason, Massenberg "concedes that the shotgun is admissible ... if the court finds that the shotgun was underneath the bed...." Therefore, we hold that the District Court did not err in admitting the shotgun into evidence for it was seized as part of a valid search incident to Massenberg's arrest.

Massenberg appeals not only the admission into evidence of the shotgun, but also the admission of his statement informing the officers of the shotgun's location. Because this statement was made before Massenberg received the required *Miranda* warnings, its admissibility can only be upheld if it were to fall within the *Quarles* exception. In other words, unlike the shotgun itself, Massenberg's statement as to the shotgun's whereabouts cannot be deemed admissible on a narrower ground like search incident to lawful arrest.

■ We decline to address whether Massenberg's statement as to the shotgun's location falls within the *Quarles* exception, for even if the statement was admitted in violation of *Miranda,* we believe that in light of the admission of the shotgun, any error in admitting the Defendant's statement was harmless. *See* Fed. R.Crim.P. 52(a). Although the officers did not discover the shotgun until after the Defendant told them it was under the bed, we are confident that had the Defendant

never made such a statement, the officers likely would have looked under the bed anyway to ensure their safety as they made the arrest. *See Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("When ... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint, and the evidence is admissible."). Furthermore, so long as Massenberg's statement was voluntary, and we believe that it was, the shotgun would still be admissible, for this Court has made clear that the fruit-of-the-poisonous-tree doctrine does not apply to derivative evidence obtained as a result of a non-*Mirandized* statement. *United States v. DeSumma,* 272 F.3d 176, 180–81 (3d Cir.2001). Accordingly, any error in the admission of the statement was harmless.

The judgment of the District Court will be affirmed.