ROGERS, Circuit Judge,
dissenting:
Because the government failed to offer evidence to show that, prior to opening the door of the lawfully parked car in which Brown was sitting, the police had articulable suspicion to believe that Brown had been engaged in criminal wrongdoing, the stop and frisk exception to the Fourth Amendment warrant requirement adopted in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is inapplicable. In Terry, the Supreme Court cautioned that a police officer’s “inchoate and unparticularized suspicion or ‘hunch,’ ’’ would not suffice to justify an intrusion into a person’s security and privacy, id. at 27, 88 S.Ct. at 1883, but that is all the evidence showed. Hence the seizure by the police after opening the car door was unlawful. Moreover, even if there had been a lawful Terry stop, because the search of the car trunk was not limited in scope in order to protect the officers, it could not be justified under Terry, id. at 29, 88 S.Ct. at 1883-84, and because the government failed to show that the officers had probable cause to believe the car trunk contained contraband or evidence of a crime, the seizure from the trunk also was unlawful. Accordingly, the district court erred in denying the motion to suppress the seized evidence.
*1174 I.
Under Terry, a police officer must have articulable suspicion of individualized criminal wrongdoing before the officer can conduct a brief investigatory stop of the individual and subject him to a pat down. 392 U.S. at 23, 88 S.Ct. at 1881. The “criminal activity [that] may be afoot”, id. at 30, 88 S.Ct. at 1884, quoted Op. at 1164, must be tied to an individual before that individual can be stopped. Terry operates on the assumption that individuals are lawabiding which is why there must be a “particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing.” United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Consistent with “independent appellate review of these ultimate determinations of reasonable suspicion and probable cause,” Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996), nothing in the record indicates that Brown or the other occupants of the black car acted in a manner to provoke police suspicion of criminal wrongdoing, see Illinois v. Wardlow, 528 U.S. 119, 124-26, 120 S.Ct. 673, 676-77, 145 L.Ed.2d 570 (2000), or that the police were relying on their experience to conclude that the occupants of a car other than the one identified by the complainant presented a threat to the officers’ safety. Cf. Texas v. Brown, 460 U.S. 730, 742-43, 103 S.Ct. 1535 1543-44, 75 L.Ed.2d 502 (1983). The government offered no evidence to show that the police had reason to think that the black car contained guns or other contraband but relies, in justifying the Terry stop, solely on the police officers’ generalized suspicions as a result of their surroundings. Reasonable suspicion for Terry purposes is not created, as other circuits have recognized, by the totality of the evidence when each piece of evidence is, by itself, a weak indicator of criminal activity or dangerousness. See, e.g., United States v. Townsend, 305 F.3d 537, 542-45 (6th Cir.2002); United States v. Gray, 213 F.3d 998, 1000-01 (8th Cir.2000); United States v. Jones, 149 F.3d 364, 369-71 (5th Cir.1998). Brown’s mere presence in the parking lot late at night several hours after a shooting does not meet the standard of articulable suspicion of individualized criminal wrongdoing that Terry requires. See Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).
Looking at the “totality of the circumstances,” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quoting Cortez, 449 U.S. at 417-18, 101 S.Ct. at 694-95), to determine whether the police conducted a lawful Terry stop, the court ignores the consequences of the fact that key evidence is undisputed. First, the police did not arrive at the scene until at least two hours, and more likely, three hours, after the shooting had occurred. The complainant called the police for assistance around 10 p.m. Even taking the latest time that the complainant testified she called for assistance, at midnight, the police did not receive a call to respond until 1:45 a.m. and did not arrive at her apartment building until after 1:45 a.m. Only after conferring with the complainant and her sister, and then going to the complainant’s apartment, did the police enter the parking lot. Second, the complainant and her sister directed the police only to the men in a white car, and said nothing about the black car or its occupants. At the suppression hearing, the complainant explained that the black car was not in the parking lot at the time of the shooting, whereas (according to the complainant’s sister) at the time of the shooting and also when the police arrived in the complainant’s apartment, the men in the white car were looking up at the window of the complainant’s apartment into which shots had been fired. Third, Brown, who was sitting in the black car when the *1175 police began questioning the men in the white car, remained in or near the black car throughout the thirty minutes that the police testified they questioned the men in the white car, and Brown did not attempt to leave the parking lot thereafter when the police approached. Although the occupants of the black car were aware that the police were questioning men in the white car, they never attempted to interfere with the police investigation. These undisputed facts known to the officers demonstrate that when the police first entered the parking lot, they had articulable suspicion as to the occupants of the white car but no reason to suspect the occupants of the black car of any criminal activity. Nor did the subsequent conduct of the occupants of the black car give the police any reason to suspect -any of the occupants of criminal activity.
The court relies on four circumstances to justify the Terry stop of Brown. The first circumstance is the neighborhood: it was known for “a lot of drug activity” and there had been several homicides and numerous calls for gunshots earlier the same year. Op. at 1165. While conceding that mere presence is insufficient, the court views the lateness of the hour as somehow “compounding]” the relevance of this circumstance. Op. at 1165. High-crime areas abound in urban centers such as Washington, D.C., and the fact that crime is often committed at night does not help identify the likely perpetrator of a particular crime. Neither the fact that the complainant lived in a neighborhood where shootings had occurred in the past year, nor the fact that it was late at night, gave the police reason to suspect that Brown was involved in the earlier shooting.
The second circumstance is that gunshots had been fired into a child’s bedroom: the court states that this “enhanced the probability” that the shots had been fired by someone inside one of the only two occupied cars in the parking lot. Op. at 1165. This statement assumes that the shooter was in a car in the parking lot. Even if this assumption is reasonable, the court also assumes that if the shooter had been in a car in a parking lot, he likely could be found in a car in the same parking lot several hours later. The evidence suggests the contrary. Not only did the police arrive several hours after the shooting had occurred, the complainant testified at the suppression hearing that after the shooting the white car had twice left the parking lot before returning, thus further indicating that sufficient time had elapsed for the shooter to come and go. In addition, the complainant was familiar with the black car in which Brown was sitting, as it often parked in the lot and played loud music, and testified that the black car was not present at the time of the shooting or when the police responded to her 911 call. Given her familiarity with the car, it is difficult to understand why she would not have told the police about the black car if it had been in the parking lot at the time of the shooting. The court discounts the complainant’s testimony because she and her sister did not see the actual shooter, Op. at 1165-1166, and yet they identified the suspect car that was in the parking lot at the time of the shooting and no other car.
The third circumstance is the activity of the man who exited the alley. Op. at 1167. The government conceded at oral argument that the police did not have articula-ble suspicion to stop the man who got out of the driver’s seat of the black car, came closer to look at the police at the white car, which was approximately fifteen feet away, walked back towards the black car, and then before reaching it left the parking lot through an alley. Given this concession and the fact that after exiting the alley the driver never returned to the black car or to the parking lot, it is difficult to under *1176 stand how his conduct contributes to the officers’ articulable suspicion of criminal wrongdoing with respect to Brown and the other occupant who remained in the car. The only testimony indicated that the police thought that the driver was “sizing [them] up” and “act[ed] quite peculiar ... as if he wanted to be involved in our conversation with these two gentlemen [in the white car].” Yet the police acknowledged that the driver said nothing to them and went on his way.
The fourth circumstance is the behavior of the remaining occupants of the black car. Op. at 1167. According to the evidence, all that happened after the driver exited the black car and left through the alley was that (1) Brown briefly exited the car and got back in, and (2) as the police, upon finishing their questioning of the men in the white car, approached the black car, a person jumped from the back seat to the front seat of the car. Characterizing these actions as “furtive gestures” in response to seeing the police, Op. at 1167, means, however, that any reaction to seeing the police is indicative of criminal complicity and thus, as the Fifth Circuit points out, destroys the inference. See Jones, 149 F.3d at 370-71. There was no testimony that when one of the occupants jumped from the back to the front seat of the black car, the officers considered that conduct, or other conduct by the occupants, to be aberrations or a “furtive gesture” that reinforced their suspicion of criminal involvement. See United States v. Edmonds, 240 F.3d 55, 61-62 (D.C.Cir.2001). Instead, Officer Branson testified that he “felt uneasy” and “was very cautious at that time.” He did not testify that the police approached the black car because they thought the occupants were involved in the earlier shooting. Rather, Officer Branson testified that they sought to verify the complainant’s story by asking whether the occupants of the black car had seen or heard the prior shooting. He also testified in speculative, vague language that he wanted to know “[w]hether or not perhaps they might have been involved with what was going on.” (emphasis added). And so he approached the black car “as if ... doing a traffic stop,” and opened the door “to make sure that [he] and [his] partner were safe.” In other words, having nothing to go on that identified the occupants of the black car as likely suspects in the prior shooting or otherwise involved in criminal activity, the police proceeded based on an assumed traffic violation although the black car was lawfully parked in a residential parking lot.
Cobbling together innocent circumstances, and drawing inferences in favor of the government that are unsupported by the evidence, see United States v. Myers, 308 F.3d 251, 255 (3d Cir.2002), the court concludes that because Brown (who was in a different car than the one identified by the complainant for the police) was in the wrong place (the parking lot behind the complainant’s apartment building) at the wrong time (late at night several hours after a shooting), the police had articulable suspicion that he was engaged in criminal wrongdoing. Op. at 1169-1170. The stop and frisk exception under Terry is unrecognizable. While the police may reasonably take into account the fact that they are conducting an investigation in a high-crime area, see Edmonds, 240 F.3d at 60, late at night, see Townsend, 305 F.3d at 542-43, and that they are investigating a crime involving a gun, see United States v. Raino, 980 F.2d 1148, 1149 (8th Cir.1992), these factors provide only generalized suspicions that are insufficient to justify an intrusion on an individual’s Fourth Amendment rights. See Edmonds, 240 F.3d at 60. While relevant, the context of the police investigation, as this court has noted, provides no “individualized suspicion of wrongdoing.” United States v. Davis, 270 F.3d 977, 979 (D.C.Cir.2001).
*1177 The government, relying on Officer Branson’s testimony, failed to present a “ ‘particularized and objective basis’ for suspecting legal wrongdoing,” Arvizu, 534 U.S. at 273, 122 S.Ct. at 750 (quoting Cortez, 449 U.S. at 417-18, 101 S.Ct. at 694-95), by any occupant of the black car. Officer Branson implicitly acknowledged the limited effect of all four circumstances on which the court relies when he testified before the grand jury and later at the preliminary hearing that he and the other police officer only wanted to question the occupants of the black car to determine whether they had any. information about the earlier shooting. Even crediting Officer Branson’s changed testimony at the suppression hearing that he also wanted to determine whether the occupants of the black car “perhaps ... might have been involved with what was going on,” he never explained what facts led him to believe that the occupants of the black car, as opposed to those in the white car, were connected to the earlier shooting. For example, he did not testify that he had any information from the men in the white car that linked the occupants of the black car to the shooting. Under Terry, being generally “suspicious” and feeling “uneasy” is not sufficient.
Further, unlike the officer in Terry, 392 U.S. at 28, 88 S.Ct. at 1883, who explained why, in his experience, the conduct he observed was not innocent but was consistent with potential thievery from stores, or the border patrol officer in Arvizu, 534 U.S. at 269-71, 122 S.Ct. at 748-49, who explained why a pattern of behavior by a minivan and its occupants indicated likely smuggling of drugs or illegal aliens, or the officer in Edmonds, 240 F.3d at 60-61, who explained why the defendant’s actions were consistent with someone trying to hide something under a car seat, Officer Branson never explained how being “sized up” by the driver, or how the “furtive gesture” of an occupant moving from the back to the front seat, or how Brown’s conduct made him suspect criminal activity by the occupants of the black car. Moreover, with respect to the threat that Officer Branson perceived, there is no testimony to explain why the conduct of the occupants of the black car as opposed to the general circumstances surrounding the police investigation created a reasonable fear other than Officer Branson’s own subjective perception of the situation. See Op. at 1166.
The objective evidence supports the desire of the police to question the occupants of the black ear about the shooting, but when the police are collecting information rather than acting on articulable suspicion of criminal wrongdoing, there are limits on the manner in which they may intrude upon an individual’s Fourth Amendment rights. See Terry, 392 U.S. at 34-35, 88 S.Ct. at 1886-87 (White, J., concurring); Gomez v. Turner, 672 F.2d 134, 140-41 (D.C.Cir.1982) (citing United States v. Wylie, 569 F.2d 62, 66-67 (D.C.Cir.1977)); United States v. Ward, 488 F.2d 162, 169-70 (9th Cir.1973). Although the intrusion on Brown’s personal security, see Michigan v. Long, 463 U.S. 1032, 1046-47, 103 S.Ct. 3469, 3479-80, 77 L.Ed.2d 1201 (1983); Terry, 392 U.S. at 9, 88 S.Ct. at 1873-74, may have been minimal when compared to an intrusion into someone’s home, the Supreme Court has established that in the absence of a specific belief of criminal activity or dangerousness by the person stopped, the intrusion is unlawful. See Long, 463 U.S. at 1051, 103 S.Ct. at 3481-82; Terry, 392 U.S. at 27, 88 S.Ct. at 1883. Because the government bears the burden of proof, see Mincey v. Arizona, 437 U.S. 385, 390-91, 98 S.Ct. 2408, 2412-13, 57 L.Ed.2d 290 (1978); Davis, 270 F.3d at 982, in the absence of any evidence of an articulable basis for the officers’ suspicion of criminal wrongdoing or the reason they were concerned for their safety, the court *1178 should not draw such inferences in the government’s favor. See Myers, 308 F.3d at 255. The court thus misses the point when it states that “[t]he officers were not required to resolve the occupants’ status before stopping them.... ” Op. at 1166. To conduct a Terry stop and search, the officers were required to have an. articulable suspicion specific to the occupants of the black car before infringing on Brown’s Fourth Amendment rights.
The court points to two factors as supportive of the officers’ “additional grounds justifying [this] fear” of physical harm as they approached the black car. Op. at 1168-1169. First, the police were approaching an automobile. Second, the black car’s tinted windows obscured the officers’ view inside the car. The court acknowledges, however, that these factors provide no support for the Terry stop itself. Op. at 1168 n. 6. Although neither officer gave any specific reason, other than the general circumstances surrounding the investigation of the earlier shooting, that would cause them to fear for their own safety from the occupants in the black car, see Long, 463 U.S. at 1049 n. 14, 103 S.Ct. at 3481 n. 14, the court considers these factors sufficient to fill the evidentiary gap with respect to the search. Op. at 1168 n. 6.
For the first factor, however, the court relies on cases in which the police already had a basis to conduct a Terry stop and search. Op. at 1168-1169. For example, in Long, 463 U.S. at 1050-51, 103 S.Ct. at 3481-82, the defendant was speeding, swerved his car into a ditch and appeared intoxicated when the police questioned him, and during questioning, the police observed a large knife in the interior of the defendant’s car; in Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), and Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the defendants were subjected to a Terry stop and search after committing traffic violations. Officer Branson’s testimony indicated that the police did not have grounds to suspect Brown was involved in the earlier shooting or other criminal activity; he testified that he approached the black car “as if ... doing a traffic stop.” Even if Officer Branson only meant by that phrase to describe a police procedure, it is nonetheless telling that at no point did he testify that he suspected the occupants of the black car as being involved in the earlier shooting. Rather, the police sought out the occupants of the black car to question them as possible witnesses or because the police were suspicious of them based on “inarticulate hunches,” Terry, 392 U.S. at 22, 88 S.Ct. at 1880, arising primarily from the general context of the police investigation. Under the court’s analysis, whenever the police approach a car in the course of investigating a shooting late at night, even a shooting that occurred several hours earlier, the police may intrude on the personal security of the occupant of a car based on a person’s mere presence in a high-crime neighborhood. Terry requires more. The predicate to a “ ‘stop and frisk’ ” under Terry is “that police do not need probable cause to conduct a brief, investigatory stop of an individual if they are ‘able to point to specific and articulable facts which, taken together with rational inferences from these facts,’ give rise to a reasonable suspicion of criminal activity” by that individual. United States v. Christian, 187 F.3d 663, 668 (D.C.Cir.1999).
The second factor, obscured vision due to the black car’s tinted windows, also does not relieve the police of their obligations under Terry. The court quotes United States v. Stanfield, 109 F.3d 976 (4th Cir.1997), Op. at 1169. However, in that case the car with tinted windows was illegally parked in the middle of the road, and the driver, a known drug-dealer, was engaged in a conversation with another known *1179 drug-dealer, who was leaning out of the window of a second-floor apartment building. Id. at 978, 981-82. By contrast, there was no evidence that the police had any grounds to think the occupants of the black car, which was lawfully parked in a residential parking lot, were guilty of a traffic violation or engaged in any criminal activity. At best, the tinted windows gave reason for the police to be more cautious when conducting a permissible Terry stop and search based on an articulable suspicion of individualized criminal activity, but the obseured-vision circumstance did not excuse Terry’s requirement that the police possess adequate suspicion to conduct a stop in the first place. So far as the government’s evidence indicated, the occupants of the black car were innocent, uninvolved bystanders and no more. See Arvizu, 534 U.S. at 277, 122 S.Ct. at 752-53.
Other cases relied upon by the court are not analogous to the instant case. Almost nothing in Raino, 980 F.2d at 1150, see Op. at 1165, is similar. In Raino, there was no information available to the police about the source of the second of three shooting incidents, the defendant’s car was double parked, and the defendant, who looked nervous, began to pull away. Id. at 1149. Other cases relied on by the government are distinguishable as Brown made no attempt to flee, see Wardlow, 528 U.S. at 121-22, 120 S.Ct. at 674-75; United States v. Smith, 217 F.3d 746, 749-50 (9th Cir.2000), and in Smith, the police officer had more than mere flight as grounds to suspect the individual defendant of criminal wrongdoing.
Failing to distinguish between police questioning of witnesses to a crime and questioning of likely criminal suspects, the government relies on authority that allows the stop of a potential witness when the crime “has just been committed.” 4 Wayne R. LaFave, Seaech and SeizuRe: A TREATISE ON THE FOURTH AMENDMENT § 9.2(b), at 24 (3d ed.1996). In such circumstances, the police must question potential witnesses immediately or very soon after the crime has taken place, see id. at 24-25, and in any event, in less time than the two to three hours that elapsed here. Even under the district court’s condensed view of the lapse of time between the shooting and the arrival of the police at the scene, the-“just committed” exception has no bearing; hours had passed and, as the complainant testified, there was sufficient time for the white car to leave the parking lot twice after the shooting before returning prior to the arrival of the police. The court does not embrace this part of the government’s argument, for Brown could “not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.” Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (citing United States v. Mendenhall, 446 U.S. 544, 556, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980)); see Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 3149-50, 82 L.Ed.2d 317 (1984). If, as the government maintains, a Terry stop did not occur when the police knocked on the car window, Brown was free to ignore a consensual encounter. Cf. Berkemer, 468 U.S. at 439, 104 S.Ct. at 3149-50. Hence, the. court properly does not rely on the failure of the occupants in the black car to respond to the officer’s knock on the car window. See Op. at 1169 n. 7.
II.
Terry also is instructive about the scope of the search that can be justified to protect an officer’s safety. See Op. at 1168 n. 6. “The sole justification of the search in the present situation [of a Terry pat down] is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reason *1180 ably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.” Terry, 392 U.S. at 29, 88 S.Ct. at 1884. The police removed Brown and the female occupant from the car and handcuffed them before taking the keys out of the ignition and opening the trunk of the car. Once the occupants were handcuffed, and because the trunk was not in any event immediately accessible to them, the rationale for a Terry search beyond the immediate surroundings of the passenger compartment evaporates. See Long, 463 U.S. at 1049, 103 S.Ct. at 3480-81; Christian, 187 F.3d at 670.
The government, consequently, does not rely on Terry for the search of the trunk but instead argues that finding the gun next to Brown in the passenger compartment of the black car gave the officers probable cause to search the trunk for other guns, ammunition, or other contraband. The court agrees, relying principally on United States v. Turner, 119 F.3d 18 (D.C.Cir.1997). Op. at 1170-1172. Its reliance on Turner is misplaced.
In Turner, the police stopped the defendant’s car because it did not have a front license plate. 119 F.3d at 18. As the officer approached the car he noticed “a strong odor of burnt marijuana” coming from the car. Id. After the defendant was unable to produce his driver’s license, the officer saw “torn pieces of cigar tobacco” in the defendant’s lap, on the seat between his legs, and on the floor at his feet. Id. The government introduced evidence that in the officer’s experience these observations were consistent with marijuana use. Id. The officer also saw, directly behind the defendant, “a clear plastic bag of green, weed-like material,” which the officer believed to be marijuana. Id. at 18-19. Moreover, although this court did not rely on evidence that the defendant had hidden the key to the trunk in his shoes, the government offered evidence that in the officer’s experience a missing trunk key is often concealed on a person’s body, including his shoes. Id. at 19. On appeal, Turner did not dispute there was probable cause for the police to search the passenger compartment of his car, but contended that the evidence was consistent only with his personal drug use and hence there was no probable cause to believe there would be additional drugs in the trunk. Id. at 20. The court rejected the personal drug use distinction and upheld a warrantless search of the trunk citing United States v. Ross, 456 U.S. 798, 824, 102 S.Ct. 2157, 2172-73, 72 L.Ed.2d 572 (1982), and Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2846-47, 69 L.Ed.2d 744 (1981). See Turner, 119 F.3d at 21. Under the circumstances shown by the evidence, the court held there was probable cause for the officer to search the trunk for drugs, distinguishing cases where police suspicion was directed at a specific container. Id. at 20, 23.
By contrast with the evidence in Turner, the evidence in the instant case shows only that Brown was in possession of a single handgun in a lawfully parked car late at night several hours after a shooting in the same area. There was no evidence that the police had reason to think that more than one gun was involved in the earlier shooting or that the gun seized was a different type of gun than the one that was used in the shooting. This case is not like those in which there are indicia of multiple firearms or other contraband. In United States v. Abdul-Saboor, 85 F.3d 664, 666, 670 (D.C.Cir.1996), cited by the court, Op. at 1171, while executing a bench warrant the police observed the defendant pick up a loaded pistol and saw a loaded semiautomatic pistol and magazine on a table. In other cases on which the court relies, Op. at 1171, the police had information that the defendant was in possession of drugs and thus had reason to think that *1181 the defendant also may have a gun, as in United States v. Conyers, 118 F.3d 755, 757 (D.C.Cir.1997), where a detailed tip from a confidential informant alerted the police to the likelihood that the defendant would be transporting drugs, or in United States v. Dunn, 846 F.2d 761, 764 (D.C.Cir.1988), where the defendant was in a townhouse that served as a retail drug operation and a gun was on a couch. There also was no evidence that the police had information to link Brown or the other occupants of the black car to unlawful drug activity; nor was there testimony that the police relied on their experience to conclude that the occupants of the black car were likely involved in unlawful drug or other criminal activity. Neither was there evidence of flight. Brown and the other occupant had remained in the immediate area knowing the police were questioning men in another car; they were in a car that was not the one that the complainant and her sister had told the police was in the parking lot at the time of the shooting. Furthermore, before the search of the trank it appears that the police knew that the black car was not registered to Brown. Brown testified that he told the police he had been given use of the car by a third man and was using the car to be with his girlfriend, although Officer Branson testified that he did not hear Brown’s explanation.
In any event, unlike Turner, the government failed to present evidence showing that probable cause existed to search the trank of the black car. The court engages in pure speculation - suggesting that Brown may have been using the gun to protect other contraband such as drugs, and that there may have been multiple guns, Op. at 1170-1171 that has no eviden-tiary basis, much less sufficient evidence to demonstrate that the police had probable cause to search the trunk. There was no evidence, as there was in Turner, that the police relied on their experience in concluding there was a fair probability that there was contraband in the trunk of the black car. Indeed, the court ignores the evidence that Officer Branson’s reason for searching the trunk had nothing to do with contraband; he was concerned about protecting the police department against civil liability for valuables that might be in the trunk. While Officer Branson’s subjective motive is not determinative, it is informative of the objective circumstances in light of his testimony that it was because he saw personal items in the passenger compartment of the car, as though someone was living there, that he decided to open the trank to check for valuables. It was the appearance of the passenger compartment, as distinct from finding a gun or suspecting that the occupants of the black car were involved in the prior shooting or unlawful drug activity, that resulted in the opening of the trunk. Thus, to defend the correctness of the holding in Turner, as the court does, Op. at 1172-1173, does not also demonstrate that its rationale is properly extended beyond its moorings.
In California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991), the Supreme Court reaffirmed its long-standing principle regarding the permissible scope of warrantless searches of automobiles based on probable cause to believe there is contraband or evidence of a crime to be found in a car: the search can go no further than is necessary to discover the object of the search supported by probable cause. In Acevedo, the Court upheld the search of a bag in the trunk of a car where the police had probable cause to believe that the bag contained marijuana, while observing that because “the police did not have probable cause to believe that contraband was hidden in any other part of the automobile ... a search of the entire vehicle would have been ... unreasonable under the Fourth Amendment.” Id. The Court reemphasized that “ ‘searches conducted outside the judicial *1182 process ... are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions.’ ” Id. (quoting Mincey, 437 U.S. at 390, 98 S.Ct. at 2412); Ross, 456 U.S. at 824, 102 S.Ct. at 2172-73. It remains true, as the Supreme Court instructed in Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925), that “[i]n cases where the securing of a warrant is reasonably practicable, it must be used
For these reasons the conclusion follows that the evidence demonstrated why the police would want to question the occupants in the black car as potential witnesses to the shooting earlier that night. It was another occupied car in the parking lot when the police were questioning the men in the white car. The complainant testified that the black car often parked in the lot behind her apartment house. Because the police were investigating a shooting they had reason to proceed cautiously, and did so, entering the parking lot with their guns drawn. But the evidence did not show that the police had more than “inarticulate hunches” that Brown or the other occupants of the black car were involved in the earlier shooting, much less in any other criminal activity. Perhaps, consistent with “the central teaching of th[e Supreme] Court’s Fourth Amendment jurisprudence,” the government might have been able to present evidence that would meet the “demand for specificity in the information upon which police action is predicated,” Terry, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18, to support the admission against Brown of the evidence seized without a warrant from the lawfully parked car in which he was sitting with his girlfriend. However, it is not the role of the court to fill in the gaps by rejecting evidence that was presented and speculating about evidence the government might have presented. See Myers, 308 F.3d at 255. The government bears the burden of proof, and under Terry, the government must present evidence that the police officer was able to articulate the specific facts that caused him to view Brown as a likely suspect in the earlier shooting. Otherwise, as Mincey, Terry, and the Supreme Court’s jurisprudence on warrantless car searches make clear, there is no principled limit on invasions by the police of a person’s security and privacy if a mere “hunch” suffices. Accordingly, because there was no evidence to show that the police had articulable suspicion of criminal wrongdoing by Brown to justify a stop and seizure under Terry, or that there was probable cause for a warrantless search of the car trunk for contraband or evidence of a crime, the district court erred in denying the motion to suppress the evidence, and I respectfully dissent.