**UNITED STATES of America,**
**Appellee,**

v.

**Morris B. CHRISTIAN, Appellant.**

**No. 98–3047.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 13, 1998.

Decided Sept. 3, 1999.

Rehearing and Rehearing En Banc
Denied Nov. 9, 1999.*

* Circuit Judge Wald did not participate in this · matter.

Gregory L. Poe, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was A. J. Kramer, Federal Public Defender.

Susan B. Menzer, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher and Elizabeth Trosman, Assistant U.S. Attorneys.

Before: SILBERMAN, GINSBURG and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Morris Christian, who was convicted of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), appeals the district court's denial of his motion to suppress the firearm. He argues that the police violated his Fourth Amendment rights by searching his car, next to which he was standing at the time of his arrest. We agree with Christian that the search, which yielded the firearm, cannot be justified as a search incident to arrest because at the time of the search the police did not have probable cause to believe he had committed a crime. We agree with the government, however, that the search was permissible as part of a valid investigatory stop and weapons search under the Supreme Court's decisions in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). We therefore affirm the judgment of the district court.

# I

On the afternoon of October 12, 1997, Officer Allee Ramadhan of the Metropolitan Police Department and his partner were stationed in an area of southeast Washington, D.C., that they characterized as "notorious for drug selling and stolen property." App. 22. From their squad car they observed Christian standing "right next to" an empty, two-door Chevrolet Camaro. He was with a woman who was holding a white plastic bag. Christian himself was holding three cans of deodorant under his arm, and two unidentifiable objects in his hand. According to Ramadhan, "as soon as he saw" the police, Christian threw the two objects through the Camaro's front window, which was open approximately five or six inches. *Id.* at 23.

The officers approached Christian and the woman to investigate. Through the car's partially open window, Ramadhan noticed a dagger with a six-inch blade wedged between the driver's seat and the front passenger's seat. Ramadhan asked whose vehicle it was, and Christian said it was his. Because the driver-side door was locked, Ramadhan asked for the car keys. After Christian handed them over, but without his consent to search, Ramadhan entered the car to secure the dagger.

While retrieving the dagger, the officer noticed two tubes of toothpaste on the floor, which Christian identified as the items he had tossed through the window. Ramadhan also noticed a bag lying on the front passenger's seat next to the dagger. He picked up the bag, felt what he thought was a weapon inside, and opened it to find a loaded, .45 caliber handgun and additional ammunition. After learning that Christian had a prior felony conviction, Ramadhan placed him under arrest. Thereafter, he "did a pat-down ... to make sure [Christian] didn't have any more guns on him." *Id.* at 39–40.

Christian was indicted for being a felon in possession of a firearm, and moved to suppress the gun on the ground that the warrantless search of his car violated the Fourth Amendment to the Constitution. Ramadhan was the only witness at the suppression hearing and testified as set forth above. Crediting the officer's testimony, the district court denied Christian's motion, stating:

The premise of ... the seizure of these items and the arrest of this defendant begins with what I think is appropriately categorized as a *Terry* stop.... [W]hen the defendant saw him, the defendant threw a couple of items into the

car. That activity in that neighborhood gave rise to a reasonable articulable suspicion that something was going on; and ... it was proper for the officer to follow up.... So that disposes of that question. When the officer then saw what he described as a large dagger sticking in between the seats, it gave rise to appropriate further action on the officer's part, including checking out that dagger [and] picking up the bag next to it, because under *Terry* the officer is permitted to [examine] by plain touch or plain feel that which might bear on the safety of the officer himself.

*Id.* at 44–46.

Christian subsequently entered a conditional plea of guilty, reserving his right to appeal the suppression ruling. *See* FED. R.CRIM.P. 11(a)(2). The court sentenced him to two years probation. This appeal followed.

## II

The government advances two exceptions to the Fourth Amendment's warrant requirement that, it contends, validate the officers' warrantless search of Christian's car. It argues, first, that the police had probable cause to arrest Christian for possessing a dangerous weapon, and therefore had authority to conduct a search incident to that arrest. It argues, second, that the officers had reasonable suspicion to stop and question Christian, and that, given their equally reasonable fear that he was armed, they also had authority to conduct a protective search for weapons.

 We decide *de novo* whether the police had probable cause, reasonable suspicion or reasonable fear. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We review the district court's "findings of historical fact only for clear error and ... give due weight to inferences drawn from those facts" as well as to the court's determination of witness credibility. *Id.* at 699, 116 S.Ct. 1657. After hearing the testimony of

Officer Ramadhan, the district court accepted the government's second argument. We do so as well.

### A

A search incident to arrest is a well recognized exception to the Fourth Amendment's warrant requirement. As the Supreme Court held in *Chimel v. California,* "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "In addition," the Court held, "it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person," as well as in "the area 'within [the arrestee's] immediate control.'" *Id.*

 The government argues that the police officers had probable cause to place Christian under arrest once they detected the dagger in plain view in the car's front seat and confirmed that the car was his. Possession of the dagger, the government contends, is a violation of D.C.CODE ANN. § 22–3214(b). The problem with the government's theory, however, is that the cited statute does not make possession of a dagger, without more, a crime.

Section 22–3214 is composed of two subsections. Subsection (a) makes it a crime to possess certain listed weapons, including machine guns, sawed-off shotguns, blackjacks, switchblades, and metal knuckles—none of which Christian had. That subsection has no specific intent requirement because, according to the District of Columbia Court of Appeals, the listed weapons are "so highly suspect and devoid of lawful use that their mere possession is forbidden." *United States v. Brooks,* 330 A.2d 245, 247 (D.C.1974). The subsection at issue here, however, § 3214(b), makes it a crime to "possess, *with intent to use unlawfully against another,* an imitation

pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon." *Id.* at 246 (emphasis added). The Court of Appeals has repeatedly held that mere possession of one of these items is not sufficient to violate the statute; there must also be evidence that the possessor intended to use it "in an assaultive or otherwise unlawful manner." *Id.* at 247.[1] Without such evidence, possession of a "dagger" is no more unlawful than possession of a kitchen knife or, for that matter, a furniture leg. *See Jones v. United States*, 401 A.2d 473, 475 (D.C.1979) (holding that defendant may be convicted for possession of furniture leg if he had "specific intent to use the weapon unlawfully against another").

Lacking any direct evidence that Christian intended to use the dagger unlawfully, the government offers two pieces of circumstantial evidence. First, it contends that "[s]ince daggers, unlike kitchen knives, have no obvious utilitarian purpose, particularly in cars, this dagger's incriminating nature was self-evident." Gov't Br. at 8. Second, it asks us to infer a possible criminal intent from the fact that the dagger and the car were in a high-crime neighborhood. But as the government conceded at oral argument, there is at least one "utilitarian" and perfectly lawful purpose for keeping a dagger in a car, particularly in a high-crime neighborhood: self-defense. *See McBride v. United States*, 441 A.2d 644, 649 & n. 9 (D.C.1982) (holding that self-defense is a lawful purpose for possession of a weapon listed in § 3214(b)). Given the possibility of a lawful purpose, and the absence of any evidence whatsoever that Christian possessed the knife for an unlawful one, the officers lacked probable cause to believe a crime had been committed.

Nor is the government assisted by the Supreme Court's statement, in *Adams v.*

*Williams*, that "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In *Adams*, although the police lacked direct evidence that the defendant unlawfully possessed the pistol in question, the circumstances surrounding his arrest supported the necessary inference. An informant had told the officers that the defendant, who was seated in a nearby vehicle, was carrying narcotics and had a gun at his waist. The Court held that the fact that "the policeman found [defendant] in possession of a gun in precisely the place predicted by the informant ... tended to corroborate the reliability of the informant's further report of narcotics and, together with the surrounding circumstances, certainly suggested no lawful explanation for possession of the gun." *Id.* at 148, 92 S.Ct. 1921. Here, however, there was a "lawful explanation" for Christian's possession of the dagger. Here the officers did not simply lack the "type of specific evidence of" Christian's intent "as would be needed to support conviction," *id.* at 149, 92 S.Ct. 1921; they lacked any evidence at all that Christian intended to use the dagger unlawfully. Without such evidence, there was no probable cause for arrest. *See Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir.1994) (holding that although "an officer need not have probable cause for every element of the offense ... when specific intent is a required element of the offense, the arresting officer must have probable cause for the element in order to reasonably believe that a crime has occurred."). And without a valid arrest, the warrantless search cannot be justified by the "search incident to arrest" exception.

---

1. *See McBride v. United States*, 441 A.2d 644, 648–49 (D.C.1982); *Jones v. United States*, 401 A.2d 473, 475–76 (D.C.1979); H.R.Rep. No. 82–538, at 8 (1951) ("The mere possession of these weapons cannot, your committee

realizes, be barred; but if the possession, coupled with criminal intent, can be shown to exist, your committee feels that appropriate punishment should follow.").

## B

The government's second justification for the seizure of the gun is that it occurred during a valid protective search for weapons under the "stop and frisk" doctrine of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Court held that police do not need probable cause to conduct a brief, investigatory stop of an individual if they are "able to point to specific and articulable facts which, taken together with rational inferences from these facts," give rise to a reasonable suspicion of criminal activity. *Id.* at 21, 88 S.Ct. 1868; *see United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *New York v. Class*, 475 U.S. 106, 117, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). The Court further upheld an officer's authority to search the individual for weapons where he has a "reasonable fear for his own and others' safety" based on an articulable suspicion that the suspect is armed and dangerous. *Terry*, 392 U.S. at 30, 27, 88 S.Ct. 1868; *Long*, 463 U.S. at 1034, 103 S.Ct. 3469.

In *Michigan v. Long*, the Court, employing the same standard applied in *Chimel*, held that the scope of a *Terry* search may extend beyond the person of the suspect. 463 U.S. at 1035, 1049, 103 S.Ct. 3469. The police, the Court said, may search " 'the [suspect's] person and the area "within his immediate control" ... mean[ing] the area from within which he might gain possession of a weapon.' " *Id.* at 1048, 103 S.Ct. 3469 (quoting *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034). In *Long*, the Court found that area to include the passenger compartment of a car outside of which the defendant was standing, after he had driven the vehicle into a ditch and gotten out to meet the investigating officers. *Id.* at 1049, 103 S.Ct. 3469. The search of the compartment was "limited to those areas in which a weapon may be placed or hidden." *Id.*

■■■ In the case at bar, the district court found that a police officer who had regularly worked "an area notorious for drug selling and stolen property" could reasonably be suspicious of someone who, "when seeing the officer," immediately "throws something into a car." App. 53. Defendant does not dispute the court's assessment that there was sufficient basis for a brief *Terry* stop,[2] and we agree because the defendant's actions raised a reasonable suspicion that he was trying to hide contraband from the officers.[3] *See United States v. Smith*, 614 F.Supp. 25, 26–27 (D.D.C.1984) (upholding *Terry* stop where, upon seeing police officers, defendant "immediately bent forward as if to hide something under the front seat"); *see*

2. In a footnote, defendant does suggest that any justification for the stop and subsequent weapons search dissipated once the officer saw the tubes of toothpaste on the floor and heard Christian say they were what he had tossed. Def. Br. at 15 n.9. But at that point the officer did not know defendant was telling the truth (the officer had not yet searched for any other objects that might have been thrown), and hence he was not obligated to break off his effort to secure the area on Christian's word alone.

3. The government contends that once Officer Ramadhan "observed a dagger in plain view in the car, he had a reasonable articulable suspicion to believe that appellant was committing a weapons offense." Gov't Br. at 16. For the same reasons discussed in Part II(A), we do not agree that the presence of the dagger in the car gave rise to reasonable suspicion that Christian was in possession of a prohibited weapon, an offense which requires specific intent. Nor do we understand why the government makes this argument. The officer did not mention the dagger as a basis for the suspicion that led to the stop. *See* App. 30–31. Although the district court did rely on the dagger to establish the reasonable fear required for the car search (as do we, see text *infra*), the court did not rely on it for the reasonable suspicion required to justify the initial *Terry* stop. *See* App. 45 ("[W]hen the defendant saw him, the defendant threw a couple of items into the car. That activity in that neighborhood gave rise to a reasonable articulable suspicion that something was going on."). As noted in the text, Christian's throw, which gave rise to the suspicion that he was trying to remove something from the officer's view, was sufficient to validate the stop.

also *United States v. Laing,* 889 F.2d 281, 283 (D.C.Cir.1989); *United States v. Williams,* 822 F.2d 1174, 1176, 1179 (D.C.Cir.1987). Nor does Christian dispute that *if* the officer could lawfully search the area where the bag was found, he was entitled to open the bag once he felt the gun. *See Williams,* 822 F.2d at 1184 ("[N]o warrant is needed for an opening of a container whose contents become known through a lawful touching of the outside."); *see also Minnesota v. Dickerson,* 508 U.S. 366, 375–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Russell,* 655 F.2d 1261, 1264 (D.C.Cir. 1981).

Defendant does, however, dispute that the police had the kind of "reasonable fear" necessary to justify a search for weapons. He further contends that, even if the police did have such reasonable fear, the car's passenger seat was not an area within his "immediate control" from which weapons could be obtained. Def. Br. at 14. We consider these two arguments in turn.

█ First, we agree with the district court that Officer Ramadhan had sufficient indication Christian might be armed and dangerous to justify a protective search for weapons. In *Long,* the Court said that "danger may arise from the possible presence of weapons in the area surrounding a suspect." 463 U.S. at 1049, 103 S.Ct. 3469. Here, the presence of a weapon was not merely "possible"; when Ramadhan arrived at Christian's car, he saw the dagger in plain view near the defendant. Within moments, Christian confirmed that the car containing the dagger was his. Moreover, as we have noted before, the presence of one weapon may justifiably arouse concern that there may be more in the vicinity, as turned out to be the case here. *See United States v. Abdul–Saboor,* 85 F.3d 664, 670 (D.C.Cir.1996).

█ Defendant protests that because his possession of the dagger was lawful, it cannot supply the justification for a protective search. But the Supreme Court expressly rejected the same argument regarding a defendant's hunting knife in *Long* itself. 463 U.S. at 1052 n. 16, 103 S.Ct. 3469 ("*Long* also argues that there cannot be a legitimate *Terry* search based on the discovery of the hunting knife because Long possessed that weapon legally.... [W]e have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed . in accordance with state law."). Even a lawfully possessed weapon may pose a threat, and because "[t]he purpose of [a *Terry*] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," the lawfulness of defendant's possession is irrelevant to this aspect of the *Terry* analysis. *Adams,* 407 U.S. at 146, 92 S.Ct. 1921.

Christian further contends that Officer Ramadhan's actions belie the government's claim that he regarded Christian as a threat. After all, he did not frisk Christian's person until after he had found the gun and placed him under arrest. Had the officer truly feared him, Christian argues, he would have frisked him before turning to the car.

█ This argument misses the mark for two reasons. First, as appellate judges we do not second-guess a street officer's assessment about the order in which he should secure potential threats. To the contrary, we must defer to his "quick decision as to how to protect himself and others from possible danger." *Terry,* 392 U.S. at 28, 88 S.Ct. 1868; *see also United States v. Wilkerson,* 598 F.2d 621, 625 (D.C.Cir.1978) (rejecting defendant's claim "that the search of the car was not a protective search because the driver ... [was] not frisked until after the officer found the gun," since this was tantamount to a request "to instruct the police on the priority of search once reasonable suspicion of danger exists"). Second, in assessing an officer's actions under *Terry,* we evaluate his conduct objectively, not subjectively. *See, e.g., Long,* 463 U.S. at 1046

n. 11, 103 S.Ct. 3469 ("[T]he propriety of a *Terry* stop and frisk is to be judged according to whether the officer acted as a 'reasonably prudent man' in deciding that the intrusion was justified."); *see also Ornelas*, 517 U.S. at 696, 116 S.Ct. 1657; *Horton v. California*, 496 U.S. 128, 138, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."). Thus, Ramadhan's actual motives for conducting the search were not relevant as long as his actions were objectively reasonable.[4] Because we conclude that they were objectively reasonable, we affirm the district court's finding that the police had a reasonable basis for conducting a *Terry* search.

■ Christian's second argument is that, even if the police had a sufficient foundation for a *Terry* search, the car's interior was beyond its lawful scope. He correctly points out that unlike the facts of *Long*, in which the defendant's car door was open, the police knew Christian's driver-side door was closed and locked, and the officer had taken the keys. Under those circumstances, he contends, the car's interior was not "within his immediate control."

■ We begin by noting that the fact that Ramadhan obtained the keys is not relevant to the analysis. The officer requested the keys to use them to open the door to secure the knife. As in the related context of searches incident to arrest, we assess a *Terry* search from the standpoint of the moment of the stop—at which time Christian still had the keys—not from the subsequent period in which the officer begins to take protective measures. Otherwise, "we might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in

an area where he could pose a danger to the officer." *Abdul–Saboor*, 85 F.3d at 669; *see In re Sealed Case*, 153 F.3d 759, 768 (D.C.Cir.1998). Since, as defendant concedes, Christian was "stopped" for *Terry* purposes from the moment the officer requested his keys, we evaluate the risk to the officer at that time.

Under these circumstances, the officers were "reasonably warrant[ed] ... in believing that" Christian could have "gain[ed] immediate control" of the weapon. It was not unreasonable to fear he might lunge for the door, open it with the keys, and grab the knife. As the Court stated in *Long*, it is mistaken to discount police concern over an individual simply "because he was effectively under their control during the investigative stop." *Long*, 463 U.S. at 1051, 103 S.Ct. 3469. To the contrary, a *Terry* suspect might well "break away from police control and retrieve a weapon from his automobile." *Id.*; *see Wilkerson*, 598 F.2d at 625 ("[S]tanding next to the car without handcuffs, either the driver or one of the passengers could have bolted to it, seized a weapon and fired before the officers could find cover."). Nor does it matter that the car door was closed; as the Court said in *Chimel*, a "gun on a table *or in a drawer* in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034 (quoted in *Long*, 463 U.S. at 1048, 103 S.Ct. 3469) (emphasis added). And while the time it would take to unlock the door would slow Christian down, the police "cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp." *United States v. Lyons*, 706 F.2d 321, 330 (D.C.Cir.1983).

■ Moreover, even if control were measured at the time the officer had the

---

4. For the same reasons, defendant is not helped by Ramadhan's testimony that he initially entered the car "to get the knife, get the

stuff out of the vehicle [that Christian] just threw inside," rather than to check for additional weapons. App. 35.

keys, we would still conclude Christian had sufficient control over the front seat of his car to satisfy the *Chimel* standard. *See United States v. Mancillas,* 183 F.3d 682 (7th Cir.1999) (holding that dashboard of car was within the area into which defendant "might reach in order to grab a weapon" where officer made *Terry* stop of defendant outside of locked car, saw gun on dashboard, and requested keys from defendant in order to open door) (quoting *Chimel*). The window of the driver-side door was open approximately five to six inches, large enough for Christian to reach his arm through to unlock the door manually. And there is no indication the officers knew or could have known whether the passenger-side door was locked. Christian or the woman with him might have momentarily broken away from police control, opened the passenger door, and seized either the dagger or the gun—which was in a bag on the passenger's seat. That these scenarios may not be probable is not decisive. As we have said before, the *Chimel* test is not whether an area was *probably* accessible to the suspect at the time of the search, but whether it was "conceivably" accessible. *Lyons,* 706 F.2d at 330; *see Sealed Case,* 153 F.3d at 768; *Abdul–Saboor,* 85 F.3d at 669 ("Showing that the area searched was 'conceivably accessible at the time of the search' was not meant to be difficult."). Accordingly, we have upheld searches "even when hindsight might suggest that

the likelihood of the defendant reaching the area in question was slight," *Lyons,* 706 F.2d at 330, and when that likelihood was substantially lower than it was here.[5]

Finally, as the Court instructed in *Long,* we must also consider that "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long,* 463 U.S. at 1052, 103 S.Ct. 3469. Had no search been conducted here, and hence no gun found, the police would eventually have permitted Christian to leave and, presumably, to re-enter his car. At that point, Christian would have had immediate access to both the knife and gun. Under these circumstances, it was appropriate to conduct a *Terry* search to ensure that such access would not endanger the lives of the departing officers. *See id.; United States v. McClinnhan,* 660 F.2d 500, 504 (D.C.Cir.1981) (upholding *Terry* search of briefcase because "[m]erely separating [defendant] from his briefcase . . . would obviate the danger only for the length of the stop; at some point they would be compelled to return the briefcase to appellant and thus place themselves in the danger they sought to avoid"); *see also United States v. Woody,* 55 F.3d 1257, 1269–70 (7th Cir.1995) (upholding search of defendant's locked glove compartment while he sat handcuffed in patrol car because of officers' anticipation that defendant and passengers would eventually return to their car).[6]

---

5. *See, e.g., United States v. Mason,* 523 F.2d 1122, 1125–26 (sustaining search of closet three or four feet away from handcuffed defendant). *Compare Abdul–Saboor,* 85 F.3d at 670–71 (upholding search of room as "conceivably accessible" to defendant who was "handcuffed, sitting on a chair" four feet outside the door with two officers, at least one of whom was armed), *with Lyons,* 706 F.2d at 330 (finding it "inconceivable that [defendant] could have gained access" to closet several yards away from where defendant, who had briefly collapsed, was "sitting, handcuffed, on a chair . . . [with] six police officers, at least four of whom presumably were armed"). *See generally Sealed Case,* 153 F.3d at 768–69 (discussing *Abdul–Saboor* and *Lyons*).

6. Our decision in *United States v. Fafowora,* 865 F.2d 360 (D.C.Cir.1989), is not to the contrary. There we held that the "brightline rule" of *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), "that the passenger compartment lies within the reach of the arrested occupant," does not apply "when the police come upon the arrestees outside of the automobile." 865 F.2d at 362. "[I]nstead, the normal framework of *Chimel* applies" and the area searched must be "within the 'immediate surrounding area' into which [defendants] might have reached at the time the [police] caught up with them." *Id.* In the instant case, the government does not urge the application of *Belton,* but rests instead on the normal framework of *Chimel.* In *Fafowora* we found the car search to be

## III

We conclude that the seizure of Christian's gun did not violate his rights under the Fourth Amendment. Accordingly, the district court properly denied defendant's motion to suppress the evidence, and we affirm his conviction.

outside the immediate surrounding area of defendants since they were arrested a car length away, walking in the opposite direction. *Id.* at 361–62. Here, by contrast, the police confronted Christian when he was standing directly next to the car.