UNITED STATES of America

v.

Thomas **HOLLY,** Defendant.

No. CR. 02–0011(RBW).

United States District Court, District of Columbia.

Sept. 9, 2002.

John Crabb, Jr., Julius Rothstein, U.S. Attorney's Office, Washington, DC, for Plaintiff.

Douglas James Wood, Roberts & Wood, Riverdale, MD, Gilda Sherrod–Ali, Sean L. Grimsley, Federal Public Defender, Washington, DC, for Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on the defendant's Motion to Suppress Physical Evidence [# 22] and the government's opposition thereto. After consideration of the parties' pleadings, the hearing testimony and representations of counsel made during oral argument that was held on August 19, 2002, the defendant's motion will be granted for the reasons set forth below.

### I. *Summary of Facts:*[1]

At the suppression hearing that was held in this matter, the government's witness, Police Investigator Joseph Abdalla of the Metropolitan Police Department ("MPD"), testified to the following: In December, 2001, Officer Abdalla received information from a confidential source that two individuals, one who used the name of "Jeff," who the source described as being 5'8" and heavy-set, and one who used the name of "Pony," who the source described as 6'3" and slim, were "storing crack, [phencyclidine] P.C.P. and a firearm inside of 461[9][2] Central Avenue, [Northeast] Apartment B." Tr. at 8. This address had previously been inhabited by a William Bowman, a convicted drug dealer, who, according to the source, had been arrested within the past two weeks on P.C.P. and cocaine charges. *Id.* at 9; Government's Opposition to Defendant's Motion to Suppress Physical Evidence ("Gov.'s Opp.") at 1. Officer Abdalla confirmed that Bowman had been arrested on November 29, 2001, for possessing a large quantity of drugs. Gov.'s Opp. at 2. The source stated that Pony and Jeff did not sell drugs at the Central Avenue apartment, but transported the drugs to Third and Todd Streets, N.E., which is approximately "five to eight miles" away from the residence, and that they carried the drugs "in some type of book bag." Tr. at 8. In addition, the source stated that these two individuals drove a "charcoal-colored Honda" with the license plate "BA 5225." *Id.* at 8–9.

On December 13, 2001, Officer Abdalla went to the residence at 4619 Central Avenue, Northeast, where he confirmed that there was mail addressed to Mr. Bowman at that address by viewing pieces of mail left in the mailbox for 4619 Central Avenue, Apartment B. Tr. at 11. On that same day, Officer Abdalla requested and obtained a Superior Court of the District of Columbia search warrant for Apartment B at 4619 Central Avenue, N.E., which authorized the police to search for and seize "cocaine, any other drug controlled substance, paraphernalia, weapons, personal papers, proof of residency and ownership, photographs, the accumulation and disposition of proceeds of narcotics traf-

---

1. References to "Tr." are to the transcript of the proceedings held in this matter on August 19, 2002.

2. Officer Abdalla mistakenly referred to the address as 4610 during his testimony, but he later corrected his mistake and affirmed that the correct address was indeed 4619 Central Avenue, N.E. Tr. at 10–11. This latter address appears on the search warrant that was issued in this case.

ficking, and any other evidence relating to narcotics trafficking." Government's Exhibit 1, Superior Court of the District of Columbia Search Warrant dated December 13, 2001 (Gov.Ex.1).[3]

The next day, December 14, 2001, at approximately 8:30 a.m., members of the Major Narcotic Branch Drug Enforcement Administration Task Force, including Officer Abdalla, traveled to 4619 Central Avenue, N.E., in preparation to execute the search warrant. Gov. Opp. at 2. Officer Abdalla and Officer Delauder were the first officers to arrive at the scene and they observed "a charcoal-colored Honda with a tag BA–5525," which was one number different from the tag number that the source had given to Officer Abdalla. Tr. at 12, 57. At approximately 8:40 a.m.,[4] the officers saw a car containing an older male and a female drive up to the apartment building, exit their vehicle and then approach and knock on the door of Apartment B. Id. A "very tall black male" answered the door, spoke with the couple, and the couple departed without entering the apartment. Id. at 12–13. Thereafter, Officer Abdalla instructed the officers in the second surveillance vehicle to maintain their surveillance of Apartment B and the Honda, while he and another officer followed the car containing the woman and older male. Id. at 13. After stopping the couple at a McDonald's restaurant nearby, Officer Abdalla questioned the female and learned she was Mr. Bowman's mother and had gone to the residence to retrieve some of Mr. Bowman's belongings, but was refused entry by the male who answered the door and was told that she would have to return later. Id. at 14.

During this brief interlude, Officer Shieder contacted Officer Abdalla and stated that two individuals had just walked out of Apartment B and were walking towards the charcoal-colored Honda, which was located across the street from the apartment. Id. at 14, 60, 91. When Officer Abdalla returned to the scene about a minute later, the officers had stopped a "tall black male, slim ... and [a black male] approximately 5'8″ in height [and with a] medium medium-to-large build." Id. at 15. The tall male was later identified as Mr. Jones, and the shorter male was later identified as the defendant, Mr. Holly. Id. Officer Abdalla was informed that Mr. Jones and Mr. Holly had walked out of the apartment and approached the Honda; Mr. Jones apparently used a key to secure the apartment after their departure. Id. at 17. The government's second and final witness, Officer Lee Nobriga, testified that another officer, Officer Francheck, also observed a "dark-colored bag" in the defendant's hand and that the defendant threw the "bag" into the back seat of the Honda, which was parked on the opposite of the street, before he was stopped. Id. at 91, 93. Officer Abdalla described the bag as smaller than a book bag and similar to a bag that is used to carry cosmetics or hair shaving items. Tr. at 74.[5]

3. Officer Abdalla stated that he ran a check on the license plate number that the informant had given him pertaining to the charcoal colored Honda, but the search did not "come back to a Honda or anything similar to it. So at that point, [he] did not include it in the affidavit." Tr. at 81.

4. It was also at this time that additional officers arrived at the scene. Tr. at 59.

5. The black pouch was "approximately 18 inches long by six-to-eight inches wide." Tr. at 18, 74–75. The government concedes that the black pouch that the defendant threw into the car was "smaller than most book bags." Gov.'s Opp. at 7.

When Officer Abdalla arrived, he saw Mr. Jones standing by the passenger side of the Honda and Mr. Holly standing at the driver's door. *Id.* The two men were surrounded by eight to ten police officers and were handcuffed.[6] *Id.* at 62–64. Officer Abdalla was informed that Mr. Holly was observed carrying a "black-type pouch" in his right hand when he was approaching the car, and that Mr. Holly had thrown the black pouch into the back seat of the vehicle. *Id.* at 18. The two individuals were "secured by the vehicle," while Officer Abdalla and the others entered the residence. *Id.* at 19–20.

When the officers entered the residence, they discovered five .38 caliber rounds of ammunition on a window sill in the living room, as well as a piece of luggage with a tag listing the defendant as the purported owner. *Id.* at 21, 86; Gov.'s Mot. at 3. Immediately upon finding the bullets, Officer Abdalla advised the two officers who remained with Mr. Jones and Mr. Holly to place them under arrest.[7] Tr. at 21. Officer Abdalla testified that it had begun to rain at some point shortly after the officers entered the apartment, and the defendant and Mr. Jones had been taken "under a front awning inside a vestibule area of 4619, Apartment B," *id.* at 23, 66, 70, which was across the street from where the car was parked, and which is where they were arrested. Defendant's Motion to Suppress Physical Evidence ("Def.'s Mot.") at 4.[8] A search of Mr. Jones revealed that he was carrying $3,210.00 and a rubber glove; Mr. Holly was in possession of $1,030.00 and was holding the ignition key for the Honda. *Id.* After Mr. Jones and Mr. Holly were both arrested for possession of unregistered ammunition, the car, including the black pouch that Mr. Holly threw into the backseat of the car, were also searched. Tr. at 21.[9] The black pouch contained a .9 millimeter loaded handgun, "a plastic bag containing a chunk of rock substance, which weighed approximately five grams" and later tested positive for cocaine, twenty-one glass vials with black tops that contained a "green-weed substance with a strong chemical odor commonly associated with P.C.P.," and a "larger applesauce jar" containing the same green-weed substance. *Id.* at 22. The subsequent search of the remaining rooms of the apartment revealed additional ammunition; two black bottle caps that fit the glass vials containing P.C.P.; and a "traffic ticket, a social security card, and a birth certificate in the defendant's name." *Id.* at 22–23; Gov.'s Mot. at 3.[10]

The car was secured for civil forfeiture proceedings and taken to the narcotics

---

6. Officer Nobriga stated that the two men were patted down prior to the time they were handcuffed. Tr. at 96. However, Officer Abdalla testified that it was not police procedure to pat down suspects prior to handcuffing them. *Id.* at 65.

7. At the time the two men were arrested the officers still had not verified their names. Tr. at 73.

8. The defendant's motion to suppress does not contain page numbers. References to the motion are to the pages in sequential order in which they were presented.

9. It is not clear from the testimony whether the entire car was searched or just the black pouch that the defendant threw into the car. Officer Abdalla stated that the bag inside the car was searched (Tr. at 21); however, when asked where the suspects were when the car was being searched, he stated that they had been taken to a vestibule area of the 4619 Central Avenue (Tr. at 23). However, Officer Abdalla's testimony overall indicates that the entire car was searched at that time. Tr. at 77.

10. The search of the apartment lasted "close to an hour"; the search of the car occurred within 5 minutes of Officer Abdalla's discovery of the ammunition. Tr. at 77–78.

branch. *Id.* at 24. Officer Abdalla stated that the officers did not consider leaving the vehicle at the scene as it had been identified as being used for drug-trafficking purposes and it belonged to a third party who was not present and could not be contacted. *Id.*[11] A search warrant for the car was subsequently issued on December 19, 2001. Government's Exhibit 2, Superior Court of the District of Columbia Search Warrant dated December 19, 2001.[12]

## II. *Analysis*

The defendant argues that the police did not have probable cause to stop and detain him at the time they handcuffed him because they had not yet executed the search warrant and he was not in the house or the car. Def.'s Mot. at 2. Therefore, the defendant posits that the officers did not have "articulable suspicion" to stop him as a result of the mere act of his exiting the house for which they had a search warrant. *Id.* at 4. In addition, the defendant argues that the officers' search of the vehicle does not fall within any exception to the warrant requirement and, once they had secured the defendant and the other suspect, the officers could have "easily obtained a search warrant" prior to their search of the car. *Id.* at 3. Thus, the defendant argues that admission of the evidence discovered in the bag during his trial would violate his Fourth Amendment rights.

The government relies upon three justifications for the officers' warrantless search of the vehicle and the bag. First, the government argues that the search of the car falls within the automobile exception to the warrant requirement because they had "probable cause to believe that the vehicle contained evidence of a crime ..." Gov.'s Mot. at 5. Second, the government argues that the officers were justified in searching the vehicle because it was in the defendant's "immediate control" at the time of his arrest and thus the search was justified under *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and its progeny. *Id.* Finally the government argues that the officers would have inevitably discovered the evidence in the car "during the standard inventory conducted at the MPD impound lot." *Id.* at 5–6. The Court will address each of the government's arguments in turn.

### A. *The Automobile Exception to the Warrant Requirement*

 The Fourth Amendment provides all citizens with the "right ... to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." U.S. Const.Amend. IV. This "fundamental right" is protected by the requirement that a warrant be issued by a neutral judicial officer prior to a search being conducted. *California v. Carney,* 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). There are, however, exceptions to the warrant requirement. *Carney,* 471 U.S. at 390, 105 S.Ct. 2066. "One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they

**11.** The officers were at some point able to determine that the Honda was registered to a female who lived in the vicinity of either Third and Todd Street or Third and V Street, Northeast. Tr. at 23. When this actually occurred is not clear from the record.

**12.** This subsequent warrant was obtained based upon information that the officers had received, subsequent to the defendant's arrest, that there were firearms stored in the Honda's door panels. The car was again searched but no items were seized.

have probable cause to believe it contains contraband or evidence of a crime." *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (citations omitted). This exception, known as the "automobile exception," *Carney*, 471 U.S. at 390, 105 S.Ct. 2066, "does not [, however,] invariably apply whenever automobiles are searched." *Sanders*, 442 U.S. at 760 n. 7, 99 S.Ct. 2586 (citation omitted).

One of the "principal bases" underlying the automobile exception is "the ready mobility" of automobiles. *Carney*, 471 U.S. at 390, 105 S.Ct. 2066; *South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). However, mobility alone does not justify the automobile exception; it is also justified by the fact that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Carney*, 471 U.S. at 391, 105 S.Ct. 2066 (citation and internal quotation marks omitted); *Opperman*, 428 U.S. at 367, 96 S.Ct. 3092. Therefore, "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play." *Carney*, 471 U.S. at 392, 105 S.Ct. 2066. In either circumstance, however, "probable cause [is] a minimum requirement for a reasonable search permitted by the Constitution." *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ The Court's analysis of whether the officers had probable cause to search the vehicle "begins with the [officers'] initial encounter [with the defendant.]" *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C.Cir.1992). The officers had the "requisite reasonable suspicion to stop the suspect if [they had] observed conduct 'which le[d] [them] reasonably to conclude in light of [their] experience that criminal activity may [have been] afoot....'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (other citation omitted). The Court concludes that the officers had "reasonable articulable suspicion" to stop the defendant when he exited Apartment B, which, based on the informant's tip and the information confirmed by Officer Abdalla, was the home of an arrested drug dealer and where drugs and a firearm were, according to the informant, currently being stored. *See United States v. Reid*, 997 F.2d 1576, 1579 (D.C.Cir. 1993), *cert. denied* 510 U.S. 1132, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994) (holding that officer's *Terry* stop of person seen exiting apartment for which officers were about to execute search warrant was reasonable, especially given the officer's "expressed concern about his safety and that of his colleagues."); *United States v. McFadden*, 722 F.Supp. 807, 809 (D.D.C.1989) (holding officers had reasonable suspicion to detain the defendant where he and his car matched the description provided by an anonymous caller regarding an individual who was "dropping off" drugs).

■ In addition, the Court concludes that the facts as presented in Officer Abdalla's testimony[13] provided sufficient probable cause for the officers to arrest the defendant for constructive possession of the ammunition. *See United States v.*

**13.** Officer Abdalla testified that there was a ticket stub and luggage tags attached to suitcases in the living room that contained the defendant's name. Tr. at 86. However, as Officer Abdalla's previous testimony confirmed that the officers had not verified the names of the two suspects at the time of their arrest, Tr. at 73, the earlier discovery of these items did not confirm that the defendant was indeed the person to whom these items belonged.

*Wahl,* 290 F.3d 370, 375–76 (D.C.Cir.2002) ("possession may be either actual or constructive. Constructive possession is established with evidence supporting a finding that the defendant had the ability to exercise knowing dominion and control over the items in question.") (citations and internal quotation marks omitted). "Probable cause to arrest requires the existence of 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense.' " *United States v. Dawkins,* 17 F.3d 399, 403 (D.C.Cir.1994). In this case, the ammunition was recovered in plain view in a room common to the apartment and from where two individuals, matching the descriptions provided by the informant, had exited; one of the individuals was seen locking the door and earlier denying entry to two individuals; and the two men walked to a car that had been described by the informant as being associated with the men, who were allegedly involved in criminal activity, and the defendant opened a door of the car and threw an item inside, thus confirming his connection to the vehicle. These facts, viewed in their totality, gave the officers probable cause to arrest the defendant. *Dawkins,* 17 F.3d at 404 (officers had probable cause to arrest defendant based on informant's tip that defendant had escaped from a juvenile facility and defendant matched the informant's general description, although the officers could not confirm whether he had a scar or dog bite on his leg as described by the informant).[14]

The question that remains regarding the defendant's arrest is whether the probable cause for his arrest extended to the officers' search of the charcoal-colored Honda. In *Garrett,* a police officer had received a citizen's complaint that narcotics were being sold by someone driving a "burgundy car with Maryland license plates 'WJB–787' " in the area of Fifth and S Streets, N.W. 959 F.2d at 1006. When the officer set up an observation post in the area of that location, he saw a burgundy vehicle with Maryland license plates "WJB–787." *Id.* He also witnessed the defendant, Garrett, and another man, codefendant Campbell, walk over to the burgundy car and exchange paper currency. *Id.* Then Garrett opened the car door and "retrieved from inside [of the car] a small object which he passed" to Campbell. *Id.* As the two men walked away, they were joined by a third man. *Id.* At this point, the officers approached the three men and Campbell dropped a pouch on the ground, which the officer testified was the same size as the item he had witnessed Garrett pass to Campbell. *Id.* The officers recovered the pouch, which was found to contain drugs, arrested Campbell and detained Garrett and the third man, and searched Garrett's car where they found additional drugs. *Id.* Garrett was then placed under arrest. *Id.*

In upholding the trial court's denial of Garrett's motion to suppress the drugs found in his car, the Court concluded that the officer had reasonable suspicion to stop the three men and thus conducted a valid *Terry* stop. *Id.* at 1007. Thereafter,

---

14. The Court notes that at the time of Mr. Jones' and Mr. Holly's arrest, the officers still did not know their names. Tr. at 73. However, the Court finds that probable cause for the arrest still existed because Mr. Jones and Mr. Holly fit the descriptions provided by the informant; the men exited from the apartment identified by the informant, and to which Mr. Jones had the key; and the men walked towards the Honda identified by the informant. These facts all confirm the statements made by the informant, and thus the Court finds that the officers had probable cause to arrest the defendant given the totality of the circumstances.

when Campbell dropped the pouch, which was found to contain drugs and matched the size of the object the officer had witnessed Garrett pass to Campbell,

> probable cause arose to believe that the drugs in the pouch came from the car and that additional drugs might be found there.... Once the officers had probable cause to believe more drugs would be found in Garrett's car, they could properly conduct a search of the entire car and any containers found therein. The trial court therefore properly denied Garrett's motion to suppress.

*Id.* at 1007–08 (citations omitted).

Similarly, in *United States v. Wider*, 951 F.2d 1283, 1285 (D.C.Cir.1991), an officer had received a telephone call that a "light-skinned black male, driving a grey-ish BMW and wearing a BMW hat, was selling drugs in the 300 Block of 53rd Street, Northeast ..." When officers arrived at that location less than twenty minutes after receiving the tip, they witnessed a "light-skinned black male in a BMW hat ... place a brown paper bag on some steps and walk away from the bag up the steps toward the street." *Id.* The officers retrieved the bag and saw that it contained "white rocks." *Id.* They then stopped the suspect and searched him, finding more bags with white rocks, which tested positive for cocaine. *Id.* The officers checked the license plates on the BMW that was parked approximately 35 feet from where the defendant was arrested, and found out the car was registered in his name. They then searched the car, retrieving additional bags with white rocks and a razor blade with what was later determined to be cocaine residue. *Id.*

In affirming the district court's denial of defendant's motion to suppress the plastic bags found on his person and the evidence found in his car, the court held that once the officers had witnessed the defendant abandon the brown bag and discovered it contained drugs, they "had an objectively reasonable belief that [the defendant] had committed a crime and therefore probable cause to arrest him." *Id.* at 1286 (citation omitted). Thus, the officers could "lawfully search for and seize any evidence on [the defendant's person] incident to the arrest." *Id.* (citation omitted). Regarding the search of the automobile, the Court held that once the officers learned that the defendant was in possession of "large quantities of crack, packaged for distribution, and that his automobile was parked nearby, there was a 'fair probability' that the vehicle contained additional evidence of drug dealing activity and therefore probable cause to search it." *Id.* (citation omitted). *See also United States v. Caroline*, 791 F.2d 197, 201 (D.C.Cir.1986) (holding police had probable cause to search defendant's automobile where they had witnessed defendant and a companion using the car during their shoplifting spree and there was a " 'fair probability' that shoplifted goods, or evidence of shoplifting, were in the car at the time of the search.").

██ The instant case is distinguishable from *Garrett* and *Wider*. The officers in this case did not have probable cause to believe that the charcoal-colored Honda contained contraband. When the officers recovered the ammunition, arrested the defendants, and searched the car, they had been searching the apartment for only approximately five minutes. Thereafter, the officers searched the apartment for approximately an additional fifty-five minutes. Therefore, at the time they arrested the defendant, the officers had not thoroughly searched the residence and did not know conclusively that the guns and drugs were not somewhere within the apartment, as the informant had told Officer Abdalla. Moreover, the informant did not state that

the car was used to transport drugs or a firearm. *See United States v. Brown,* 616 F.Supp. 1319, 1320 (D.D.C.1985) (holding that officers did not have probable cause to conduct a search of defendant's vehicle where the "reliable informant" merely stated that the defendant was dealing drugs and drove his car, which the informant described, to his mother's house. "There was no indication that the informant knew there was contraband in the car."). Nor did the officers observe the defendant and his companion engage in any suspicious behavior. *See Garrett,* 959 F.2d at 1006 (officer observed what appeared to be a drug transaction); *Wider,* 951 F.2d at 1285 (officer witnessed defendant drop bag containing contraband); *Caroline,* 791 F.2d at 201 (officer observed defendants engaged in suspicious behavior after exiting store and confirmed that they had been shoplifting). Further, the bag the defendant was observed to throw into the vehicle did not appear to be a book bag, which was the type of bag the informant said was used to store and transport the drugs. *See Garrett,* 959 F.2d at 1006 (defendant seen giving co-defendant the same type of bag the co-defendant later dropped and from which drugs were recovered). And, the informant did not say the gun was stored or carried in the bag. *See* Tr. at 8 ("the source further stated that they carried those *drugs* in some type of book bag.") (emphasis added). There was, in this case, also no information that the Honda was used to keep or transport drugs or a firearm. Therefore, finding the ammunition did not give the officers probable cause to search the defendant's car and the pouch on the theory that drugs or a gun would probably be found in one or

the other.[15] It is thus the Court's conclusion that the officers' discovery of the ammunition did not give them immediate probable cause to search the vehicle.

### B. *Search Incident to Arrest*

 The government next argues that the search in this matter was justified because the car was in the defendant's "immediate control" at the time of his arrest. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "A search incident to arrest is a well recognized exception to the Fourth Amendment's warrant requirement." *United States v. Christian,* 187 F.3d 663, 666 (D.C.Cir.1999), *cert. denied,* 529 U.S. 1030, 120 S.Ct. 1444, 146 L.Ed.2d 331 (2000). The requirements for conducting such a search are that it be made contemporaneously in time and place to the arrest of the accused. However, "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." *Chambers,* 399 U.S. at 47, 90 S.Ct. 1975 (internal quotation marks and citations omitted). Under the search incident to arrest exception, "it is reasonable for the arresting officer to search ... the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034. *See also United States v. Lyons,* 706 F.2d 321, 330 (D.C.Cir.1983) (in determining whether a warrantless search was conducted incident to an arrest, the court must ask "was the area in question, at the time it was searched, conceivably

---

**15.** The government concedes that the pouch was smaller than most book bags. Gov.'s Opp. at 7. And, at the time the car was searched, the police had not determined whether or not a book bag was in the apart-

ment. Thus, seeing the defendant with the pouch, along with the other information known by the officers, did not give the officers probable cause to believe it contained evidence or contraband.

accessible to the arrestee—assuming that he was neither 'an acrobat [nor] a Houdini?' ") (citations omitted).

In *Chimel,* the police arrested the defendant, pursuant to an arrest warrant, at his home for his alleged participation in the burglary of a coin shop. *Id.* at 753, 89 S.Ct. 2034. Despite the defendant's objection, the officers conducted a search purportedly incident to defendant's arrest and "then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop[,]" seizing coins and other items. *Id.* at 754, 89 S.Ct. 2034. In reversing the defendant's conviction, the Supreme Court held that the search in this case was unreasonable in the absence of a search warrant, *id.* at 764, 89 S.Ct. 2034, stating "[t]here is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." *Id.* at 763, 89 S.Ct. 2034.

*Chimel* established that a search incident to an arrest can not include a wholesale search of areas that are not within the suspect's reach or "immediate control." The question for this Court to resolve therefore is whether the car could have been construed by the officers as being within the defendant's "immediate control" at the time he was arrested. The Court finds that it cannot. Had the defendant been arrested on probable cause or even detained on *Terry* grounds when he was standing next to the car, the Court's conclusion would possibly be different. *See, e.g., Christian,* 187 F.3d at 668 (affirming

district court's denial of defendant's motion to suppress where officers searched, pursuant to *Terry* stop, car that he was standing directly next to after observing him "immediately" throw items into a car when he saw the officers and the officers saw a dagger in the car upon confronting the defendant).[16]

■ However, a search incident to an arrest is determined at the time of the arrest. And, according to Officer Abdalla's own testimony, the defendant in this case had been secured, moved to a location across the street from the vehicle, and had already been handcuffed when the car was entered and the bag was seized. Thus, "[o]nce [the] accused [was] under arrest and in custody, then a search made at another place [not within the suspect's control], without a warrant, is simply not incident to the arrest." *Chambers,* 399 U.S. at 47, 90 S.Ct. 1975 (internal quotation marks and citations omitted). Because the interior of the car was not in defendant's "immediate control" at the time and place of his arrest, the search of the vehicle cannot be justified as incident to his arrest. *See Lyons,* 706 F.2d at 331 (holding that search of closet in defendant's hotel room was not incident to his arrest; at the time of the search, the defendant was sitting handcuffed in a chair by the doorway and the closet was "several yards away" from him. Thus, it was "inconceivable that [the defendant] could have gained access to the area."); *McFadden,* 722 F.Supp. at 810 (holding that evidence recovered from defendant's automobile would be suppressed where "defendant was taken into

---

16. Even if the officers had conducted a search pursuant to a *Terry* stop, the resulting search of the car may not have been justified. Although the Court in *Christian* concluded that the officer's search of the vehicle in that case was reasonable, the facts of that case are readily distinguishable from this case. In *Christian,* the officer saw a dagger lying inside the car in plain view; thus, the Court concluded that the search of the car was justified as "[i]t was not unreasonable to fear [that the defendant] might lunge for the door, open it with the keys, and grab the knife." 187 F.3d at 670.

custody several blocks from where the [car] was parked."); *Lewis v. United States*, 632 A.2d 383, 384 (D.C.1993) (holding that search of vehicle that suspect had "parked, exited, locked and walked away from before a police officer initiated contact with him fifteen to twenty feet away" was unconstitutional under the Fourth Amendment, despite the fact that the officer testified that he became suspicious that the car contained contraband when he was approached by known drug users and dealers who asked for the keys to the vehicle).[17]

### C. Inevitable Discovery

The government's final argument is that the recovery of the items in the black pouch was inevitable in any event as a result of the Metropolitan Police Department's "standard inventory procedures." Gov.'s Opp. at 11. The government argues that the police needed to take and secure the car because it had been "identified as being used by Mr. Holly and Mr. Jones for drug-trafficking purposes ... [and] it was also registered to a third party who was not on the scene" and could not be contacted. Tr. at 24. The government argues that once the officers had taken the vehicle, they would have conducted a routine, post-impoundment inventory search, Gov.'s Mot. at 11–12, and discovered the gun and drugs.

When evidence "would have inevitably been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and all the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). However, the "inevitable discovery [exception] involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Id.* at 444–45 n. 5, 104 S.Ct. 2501. The government in this case argues that the police would have inevitably discovered the evidence at issue because police procedure required that they impounded the vehicle and they would have thereafter conducted a post-impoundment inventory search.

Inventory searches have been recognized as "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). This is because the "policies behind the warrant requirement are not

---

**17.** During his oral argument, government counsel stated that *United States v. Mitchell*, 64 F.3d 1105 (7th Cir.1995) was a case "where someone is arrested and removed from the room where" the briefcase he had been holding was searched. Tr. at 127. *Mitchell* is inapposite to the present case. At the time the defendant in *Mitchell* was arrested he had been holding an open briefcase which fell to the floor when the officers entered the room. 64 F.3d at 1110. It was "while in the act of arresting [the defendant that the officer] noticed what looked like drugs in the open briefcase." *Id.* The court upheld the search of the briefcase as being "contemporaneous with the [defendant's] arrest." *Id.* Unlike *Mitchell*, the black pouch in this case was not in defendant Holly's control at the time he was arrested and thus cannot be justified as being searched incident to his arrest, especially when he had been moved across the street from the vehicle by the time of his arrest. Similarly, *United States v. White*, 871 F.2d 41, 42 (6th Cir.1989), also relied upon by the government, is distinguishable as the defendant in that case had been arrested for driving while intoxicated. Although the car was not searched until after the defendant had been placed into the police cruiser and handcuffed, he was riding in the automobile at the time he was stopped, *id.* at 44, and thus his situation is distinguishable from the present situation where the defendant was not in the car, or even near it, when he was arrested.

implicated in an inventory search ... nor is the related concept of probable cause[.]" *Id.* (citations omitted). Therefore, such searches have been held to be reasonable. *Opperman*, 428 U.S. at 372, 96 S.Ct. 3092. The question in this case is whether the police were entitled to remove the vehicle from its location, when the informant did not state the vehicle was used for drug-trafficking purposes; there is no evidence that it was illegally parked, *cf. Opperman*, 428 U.S. at 366, 96 S.Ct. 3092 (officer observed defendant's car illegally parked in a restricted zone); and the record is silent as to when the officers discovered that the vehicle belonged to someone other than the defendant. Tr. at 24.

"[A]s Opperman makes clear, a condition precedent to a constitutionally permissible inventory search is lawful possession by the authorities of the vehicle." *Arrington v. United States*, 382 A.2d 14, 18 (D.C. 1978). In the absence of any evidence that the car was illegally parked, and having concluded that the officers did not have probable cause to suspect that drugs were present in the car, the Court concludes that the police cannot rely upon the inventory search exception to justify their warrantless search of the vehicle.[18]

In addition, the government has failed to present any evidence that the impoundment of the car was pursuant to police procedure. It is the government's burden to "establish by a preponderance of the evidence that the [seized evidence] ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444, 104 S.Ct. 2501. Despite Officer's Adballa's testimony that the vehicle was "identified as being used by Mr. Holly and Mr. Jones for drug-trafficking purposes[,]" the facts, as established by defense counsel on cross-examination revealed that there was never any indication by the informant that the car was used to transport or store narcotics, nor did the officer's report regarding the details provided to him by the informant contain that information. Tr. at 51. Further, nothing observed by the officer confirmed that the car was being used for such purposes.[19]

In any event, the Court concludes that the facts of this case do not support application of the inevitable discovery doctrine. The search warrant regarding the residence makes no mention of the car and the agents "neither obtained an order of forfeiture nor a search warrant prior to conducting the search" of the vehicle. *United States v. Fleming*, 31 F.Supp.2d 3, 6 (D.D.C.1998) (holding inevitable discovery doctrine did not apply to discovery of gun in defendant's vehicle where defendant was holding keys to vehicle at the time of his arrest, although he denied driving a vehicle at that time; "[t]he arrest warrant in no way involved a traffic offense or the use of [the defendant's] car [and][g]iven the ample amount of time in which [the officers] could have obtained judicial approval, and the lack of any nexus linking [the defendant's] arrest to his vehicle, an inventory search was not inevitable."). *Cf. Gale*, 952 F.2d at 1416 (applying inevitable discovery rule to search of defendant's person and automobile trunk; evidence "would certainly have been discovered when the police searched his person incident to his arrest ... and his car

---

18. The Court notes, in addition, that there is no evidence that the officers made any inquiry of the defendant concerning ownership of the car.

19. Since the informant reported that the drugs that were being stored at the apartment were being sold five to eight miles away from that location, it could be reasonably inferred that a vehicle would be used to transport the drugs to that location. No direct evidence of this fact was presented by the government, however.

[that he was riding in at the time of his arrest] pursuant to a post-impoundment inventory search ...") (citations omitted).[20] The inevitable discovery doctrine therefore fails to salvage the search of the vehicle and the bag that was recovered therein.

The Court does not relish having to suppress the evidence in this case. From the evidence presented during the evidentiary hearing, it appears that the defendant was indeed in possession of a firearm and narcotics in an amount that clearly indicates his intent to distribute them. Drugs and guns have had and continue to have a devastating effect on this community. And, as a result of this suppression, the defendant will avoid responsibility for his alleged actions. However, as the Fourth Amendment is designed to protect all persons, regardless of their conduct, from unreasonable searches and seizures and, where as here, police officers have acted beyond their constitutional boundaries, the Court has no recourse other than to suppress the fruit of their illegal search. Thus, the defendant's motion to suppress must be granted.

**SO ORDERED** on this 9th day of September, 2002, *nunc pro tunc* to August 29, 2002.[21]

### ORDER

For the reasons set forth in the Memorandum Opinion that accompanies this order, the defendant's motion to suppress [# 22] is granted.

---

**20.** Although the Court concludes that the inventory exception to the warrant requirement is not applicable, there is a question whether, once the officers conducted the search of the apartment without any success of finding the gun or drugs, they, at that point, had probable cause to believe that the gun was located in the car, and the drugs and gun recovered from the car would have therefore been inevitably recovered. *See Gale,* 952 F.2d at 1415 ("probable cause [to arrest suspect] arose seconds later when [defendant] admitted he was engaged in criminal conduct."). Assuming the applicability of the inevitable discovery doctrine to this situation, the Court finds that there was nonetheless no probable cause to search the vehicle at that time. *Cf. United States v. Alston,* 832 F.Supp. 1, 4 (D.D.C. 1993) (holding that evidence would not be suppressed where officers had probable cause to seize vehicle where vehicle was listed as stolen, and the officers would have been obliged to conduct an inventory search of the vehicle, wherein evidence would have been inevitably found). In fact, the warrant application that caused the issuance of a warrant for the car in this case four days after the search of the apartment states that "[w]ithin the past forty-eight hours, [Confidential Source # 1] reports that it has personal knowledge, through associates of Thomas Holley, that secreted inside of the two door, Honda Accord ... are additional firearms ... [that] may be secreted inside the door panels of the vehicle." Thus, the warrant application itself supports the Court's opinion that even after the thorough search of the apartment and the search of the defendant's and his companion's persons failed to reveal a gun or drugs, at that time the officers were still without probable cause to search the vehicle.

**21.** An order consistent with the Court's ruling accompanies this Memorandum Opinion.